**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KALSHIEX LLC, | Case No. |
| Plaintiff, | COMPLAINT FOR PERMANENT INJUNCTIVE AND DECLARATORY RELIEF |
| vs. | |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois; JB PRITZKER, the Governor of Illinois in his official capacity; DIONNE R. HAYDEN, in her official capacity as Chairperson of the Illinois Gaming Board; SEAN BRANNON, in his official capacity as Member of the Illinois Gaming Board; STEPHEN R. FERRARA, in his official capacity as Member of the Illinois Gaming Board; CALEB J. MELAMED, in his official capacity as Member of the Illinois Gaming Board; and MARCUS D. FRUCHTER, in his official capacity as Administrator of the Illinois Gaming Board, | |
| Defendants. | |

Plaintiff, KalshiEX LLC, by and through its undersigned attorneys, states as its Complaint for Injunctive and Declaratory Relief against Defendants as follows:

**<u>INTRODUCTION</u>**

1. This action challenges the State of Illinois's clear violation of the Supremacy Clause with respect to the regulation of event contracts. The federal Commodity Exchange Act ("CEA") grants the Commodity Futures Trading Commission ("CFTC") "exclusive jurisdiction" over event contracts when they are "traded or executed on a contract market" that has been federally "designated" for that purpose. 7 U.S.C. § 2(a)(1)(A). Plaintiff KalshiEX LLC ("Plaintiff" or "Kalshi") operates a federally designated contract market ("DCM") on which the CFTC has permitted it to trade sports events contracts. But just last week, Illinois enacted SB

3019, which impermissibly usurps the CFTC's exclusive jurisdiction by barring DCMs from offering sports event contracts unless they obtain a state license (at a cost of millions of dollars) and comply with a range of intrusive state gambling regulations—including a requirement that their contracts be offered exclusively to Illinois residents. 230 ILCS 45/25-1 *et seq*.

2. As a result, on July 1, 2026, when the relevant provisions of SB 3019 go into effect, Kalshi will be subject to criminal penalties in Illinois unless it either ceases to offer Illinois residents sports event contracts that are perfectly lawful in the eyes of Kalshi's exclusive federal regulator or pays Illinois millions of dollars and submits to the State's regulatory regime. Worse still, either option will put Kalshi in direct violation of federal law because the CFTC requires that all DCMs offer nationwide, uniform access to their markets. *See* 17 C.F.R. § 38.151(b).

3. The Supremacy Clause does not tolerate that result. Indeed, the CFTC has already filed suit in this Court seeking injunctive relief against Illinois's unconstitutional attempt to circumvent federal law and impose its own regulations on DCMs under SB 3019 and other state laws. *See* Am. Compl., *United States v. Illinois*, No. 1:26-cv-3659 (N.D. Ill. Jun. 17, 2026), Dkt. No. 30 ("Ill. Am. Compl.").

4. Plaintiff Kalshi seeks injunctive and declaratory relief to prevent Illinois officials from enforcing SB 3019 or any of Illinois's other state gambling laws against Kalshi based on its operation of a federally regulated DCM.

5. The merits of Kalshi's preemption claim are plain. The CEA grants the CFTC "exclusive jurisdiction" over instruments, including "swaps," traded on DCMs. 7 U.S.C. § 2(a)(1)(A). The CEA then provides that "swaps" include event contracts, defining the term "swap" to cover a "contract" for a "payment . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a

2

potential financial, economic, or commercial consequence." *Id.* § 1a(47)(A)(ii). The CEA also expressly grants the CFTC—*and only the CFTC*—the power to bar "event contracts" involving "gaming" from DCMs if the CFTC determines that trading in those contracts is not in the "public interest." *Id.* § 7a-2(c)(5)(C). Using that delegated authority, the CFTC recently promulgated a Notice of Proposed Rulemaking that sets out a detailed federal framework regulating the trading of sports events contracts on DCMs. And elsewhere in the federal code, Congress has made clear that transactions executed on DCMs are *not* bets or wagers. *See* 31 U.S.C. § 5362(1)(E)(ii) (providing that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act").

6. SB 3019 contravenes all of these Congressional commands by asserting state jurisdiction over event contracts traded on DCMs, subjecting sports event contracts to state regulatory requirements that squarely conflict with the federal ones, and redefining exchange-traded event contracts as "exchange wager[s]." SB 3019 Art. 130; 230 ILCS 45/25-10, 20. Specifically, SB 3019 amends the definition of "sports wagering" in the Illinois Sports Wagering Act to include an "exchange wager," which is defined as "an agreement, *contract*, transaction, or *swap* that is *offered, traded, or executed on a prediction market or exchange* tied to a sporting contest or sporting event." *Id.* 45/25-10 (emphasis added). In so doing, SB 3019 explicitly subjects contracts and swaps offered on federally regulated DCMs like Kalshi to the state licensing regime, which bars Kalshi from offering sports event contracts unless the state agrees to give it a license, for which Kalshi must pay millions of dollars. 230 ILCS 45/25-30(b). SB 3019 further requires Kalshi to comply with a host of state gambling laws, including the requirement that licensed entities may only accept trades "from a person physically located in the State." 230 ILCS 45/25-

3

25(e). Kalshi cannot comply with those state-specific requirements without violating the CFTC's requirement that DCMs must provide "impartial access" to their markets. 17 C.F.R. § 38.151(b).

7. In short, SB 3019 is preempted several times over. It expressly violates the CEA's "exclusive jurisdiction" provision by asserting concurrent state jurisdiction over sports events contracts traded on federally regulated DCMs; it intrudes on the field of exchange-traded derivatives that Congress has reserved entirely for the federal government; and it forces regulated entities to choose between violating federal or state law.

8. Multiple courts have recognized that analogous state efforts to regulate event contracts traded on a DCM under state gaming statutes are flatly preempted. For example, the Third Circuit recently upheld a district court's determination that Kalshi is entitled to a preliminary injunction against New Jersey's efforts to enforce its gaming laws against Kalshi, explaining that, because "Congress gave the CFTC exclusive jurisdiction over trades on DCMs," the CEA "preempts [state] law from reaching into Kalshi's CFTC-licensed DCM." *KalshiEX LLC v. Flaherty*, 172 F.4th 220, 231 (3d Cir. 2026).

9. A district court in the Ninth Circuit reached the same conclusion in issuing a preliminary injunction, barring Arizona officials from enforcing state gambling laws against Kalshi and other similar exchanges. *See, e.g.*, *KalshiEX LLC v. Johnson*, --- F. Supp. 3d ---, No. CV-26-1715, 2026 WL 1223373 (D. Ariz. May 5, 2026). Other courts have agreed. *See Flaherty*, 2025 WL 1218313, at *6 (holding "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies"); *KalshiEX LLC v. Orgel*,

No. 3:26-cv-34, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies.").[1]

10. Kalshi is similarly entitled to a preliminary injunction barring Illinois from enforcing SB 3019 or any other state gambling laws against it. By enacting the new law, Illinois has taken an extraordinary step in challenging the CFTC's exclusive jurisdiction to regulate DCMs, like Kalshi, pursuant to the CEA. Illinois apparently deems itself unencumbered by the Supremacy Clause and federal law such that it is free to impose its own regulatory regime on a 50-state federal derivatives exchange that is operating in conformance with federal law, as confirmed by its exclusive federal regulator. A preliminary injunction is necessary to restore the federal-state balance that the Constitution mandates.

11. Moreover, without emergency injunctive relief against the enforcement of SB 3019, Kalshi will be irreparably harmed when SB 3019 takes effect on July 1. If Kalshi complies with the new state law by ceasing to offer its sports event contracts in Illinois, that would put Kalshi in violation of the CFTC's uniformity requirements, harm Kalshi's commercial interests, and require the company to implement complex and expensive technological solutions to limit access in Illinois—incurring costs that would not be recoverable when Kalshi ultimately prevails in the action. Additionally, Kalshi faces similar irreparable harms if it attempts to comply with SB 3019 by offering sports events contracts in compliance with Illinois's costly and restrictive licensing and regulatory regime. Nor can Kalshi avoid these harms by simply disregarding the unlawful

---

[1] While some courts have denied preliminary relief to Kalshi, Kalshi has appealed those decisions to vindicate its right to operate free from state interference. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025), *appeal pending*, No. 25-1892 (4th Cir.); *KalshiEX, LLC v. Hendrick*, 817 F. Supp. 3d 1014 (D. Nev. 2025), *appeal pending*, No. 25-7516 (9th Cir.); *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026), *appeal pending*, No. 26-3196 (6th Cir.).

State requirements because an enforcement action by Illinois could subject Kalshi to criminal penalties. And even civil enforcement would impair Kalshi's existing contracts with consumers and business partners; subject Kalshi's users to uncertainty, loss, and potential penalties; undermine confidence in the integrity of Kalshi's platform; threaten Kalshi's prospective business relationships; and jeopardize Kalshi's status as a CFTC-approved exchange. All of these consequences would flow from Kalshi's engagement in conduct that is federally authorized and approved by a federal agency with "exclusive jurisdiction."

12. The Supremacy Clause is designed to prevent this intolerable situation by making clear that—where federal and state law conflict—state law must give way. Kalshi therefore respectfully requests that this Court grant the preliminary and permanent injunctive and declaratory relief necessary to restore the federal government's exclusive jurisdiction over event contracts traded on DCMs.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Supremacy Clause of the United States Constitution. The federal question presented is whether Illinois's recently enacted SB 3019 and existing Illinois laws (such as 230 ILCS 45/25-20 *et seq.*), which may be applied to prohibit or regulate trading event contracts on DCMs, are preempted by the CEA, 7 U.S.C. §§ 1 *et seq*.

14. The Eleventh Amendment imposes no bar to this Court's jurisdiction in this suit for prospective declaratory and injunctive relief against state officials. Under the Eleventh Amendment, as construed in *Ex parte Young*, 209 U.S. 123 (1908), "a private party can sue a state officer in his or her official capacity to enjoin prospective action that would violate federal law." *Ameritech Corp. v. McCann*, 297 F.3d 582, 585-86 (7th Cir. 2002) (citation omitted).

15.     Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).  Defendants perform their duties in and thus reside in this District.  A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

16.     Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

17.     Defendant Kwame Raoul is sued in his official capacity as Attorney General of Illinois.

18.     Defendant JB Pritzker is sued in his official capacity as the Governor of Illinois.

19.     Defendant Dionne R. Hayden is sued in her official capacity as Chairperson of the Illinois Gaming Board.

20.     Defendant Sean Brannon is sued in his official capacity as a member of the Illinois Gaming Board.

21.     Defendant Stephen R. Ferrara is sued in his official capacity as a member of the Illinois Gaming Board.

22.     Defendant Caleb J. Melamed is sued in his official capacity as a member of the Illinois Gaming Board.

23.     Defendant Marcus D. Fruchter is sued in his official capacity as an Administrator of the Illinois Gaming Board.

24.     Together, Defendants would be responsible for enforcing any demand for Kalshi to comply with Illinois state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

**A.  An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.**

25.  Derivatives contracts are financial tools used to mitigate risk.  Event contracts are a quintessential example of a derivatives contract.  They identify a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date.  Most commonly, event contracts involve a binary question:  Every "yes" position has an equal and opposite "no" position.  For example, a derivatives contract might center around whether a magnitude 8 earthquake will take place in Los Angeles County before January 1, 2027.  A purchaser may trade on either the "yes" or the "no" position on the contract.  If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

26.  Event contracts are typically traded on an exchange—like the nationwide DCM operated by Kalshi—on which traders exchange positions with other traders in the marketplace.  Importantly, event contracts do not reflect a "bet" against the "house."  Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").  Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

27.  The value of an event contract on a DCM like Kalshi is determined by market forces.  An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence.  During that period, individuals can buy and sell the contract at its fluctuating prices.

The ultimate value of an event contract is determined at its expiration date. If the underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

28. Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by data points the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

29. Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

30. To give just some of the many examples, this past February, researchers at the Federal Reserve published a paper, in which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers."[2] Findings in that paper included that "Kalshi markets are well-

---

[2] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets* 1, Fin. & Econ. Discussion Series Paper 2026-010, Bd. of Governors of the Fed. Rsrv. Sys. (Feb. 12, 2026), https://perma.cc/9EY4-M3HY.

9

behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[3] Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Federal Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[4] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[5] And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[6]

31. Other examples abound: Kalshi recently announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[7] The partnership is designed to expand institutional access to data from Kalshi's market and to facilitate trading by those same institutional investors on Kalshi's platform.[8] And late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[9]

---

[3] *Id.* at 2-3.

[4] *Id.* at 3.

[5] *Id.*

[6] *Id.*

[7] *Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets*, Tradeweb (Feb. 19, 2026), https://perma.cc/TX3T-V9XA.

[8] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradeweb Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://perma.cc/K292-RLGK.

[9] *See* Ryan Frazier, LinkedIn (2025), https://www.linkedin.com/posts/activity-7386091007588749312-rhxN [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. Times DealBook (Dec. 2, 2025), https://perma.cc/VUY8-HCDT.

32.     Sports event contracts offer the same valuable opportunity for hedging financial risk associated with sports.  For example, Game Point Capital is a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic exposure.[10]  Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in risk annually.[11]

33.     Other market participants have recognized the hedging utility of sports event contracts as well.  In an April 2026 submission to the CFTC on event contracts and prediction markets, Susquehanna International Group explained that media companies and advertisers use sports-related event contracts to hedge risks tied to viewership, game outcomes, point spreads, and totals, and that businesses are already using these markets to hedge real economic risks.[12]  Similarly, Underdog Sports, a fantasy sports company, uses Kalshi as a tool to "hedge against volatility" on its own platform.[13]

34.     Event contracts—including sports event contracts—are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions.  For example, a company that sponsors a professional sports team might look to a prediction market to assess how well the team is predicted to perform, and thus how

---

[10] *Services*, Game Point Cap., https://www.gamepointcapital.com/services; *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024)*, https://perma.cc/XLY7-LBFJ (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance).

[11] Andrew Ross Sorkin et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times DealBook (Feb. 10, 2026), https://perma.cc/VP2T-NLP5.

[12] *See* Susquehanna Int'l Grp. LLP, Comment Letter on Prediction Markets (Apr. 30, 2026), https://perma.cc/FYB6-6B5X.

[13] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://perma.cc/BT4A-BK8T.

lucrative its sponsorship is likely to be. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions. This is not theoretical. Kalshi has recently announced partnerships with CNN and CNBC, which make use of its market data in their reporting.[14]

35. Kalshi has recently launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[15] Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B. The CEA Establishes an Exclusive Federal Scheme for Regulating Event Contracts Traded on DCMs, including Kalshi.**

36. The CEA establishes a comprehensive federal scheme for regulating the trading of derivatives—including event contracts.

37. Under that scheme, the public can only trade event contracts and other derivatives on a board of trade like Kalshi that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). To be designated as a DCM, an entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show

---

[14] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Bus. Insider (Dec. 4, 2025), https://perma.cc/6XNU-XXND; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025), https://perma.cc/D2SH-ZLF7

[15] *See Kalshi launches new research arm*, Kalshi News (Dec. 22, 2025), https://perma.cc/9MTE-VUGG.

that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. *Id.* § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. *Id.* § 38.3(a)(1).

38. The CEA expressly grants the CFTC "exclusive jurisdiction" over derivatives traded on DCMs—including event contracts. 7 U.S.C. § 2(a)(1)(A). Specifically, the statute provides that the CFTC "shall have exclusive jurisdiction" that covers "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option' [or other specified instruments]), and transactions involving swaps or contracts of sale of a commodity for future delivery" where the derivative is "traded or executed on a contract market designated pursuant to section 7." *Id.*

39. The CEA then defines "swap" to cover a wide range of instruments including event contracts. It specifies that a "swap" includes "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). And lest there be any doubt, it includes a catch-all defining "swap" to cover any instrument "that is, or in the future becomes, commonly known to the trade as a swap." *Id.* § 1a(47)(A)(iv).

13

40.     The term "commodity" is given a similarly broad meaning, which includes occurrences.  7 U.S.C. § 1a(9).  The CEA includes a special category known as "excluded commodit[ies]" (because they are excluded from certain statutory restrictions on trading) that covers intangibles like an interest rate, *id.* § 1a(19)(i), or "an occurrence, extent of an occurrence, or contingency . . . beyond the control of the parties to the relevant contract" and "associated with a financial, commercial, or economic consequence."  *Id.* § 1a(19)(A)(iv).  The CEA therefore makes clear that "event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities" that are based on an "occurrence, extent of an occurrence, or contingency." *Id.* § 7a-2(c)(5)(C)(i).

41.     The CEA also contains a "Special [R]ule" for "Event Contracts."  *Id.* § 7a-2(c)(5)(C)(i).  Recognizing that certain event contracts might warrant closer CFTC scrutiny, Congress authorized the CFTC to review and prohibit six categories of contracts if it concludes they are "contrary to the public interest."  *Id.* § 7a-2(c)(5)(C)(ii).

42.     The Special Rule provides that the CFTC "may"—but need not—"determine" that event contracts are contrary to the public interest if they "involve":

(I)     activity that is unlawful under any Federal or State law;
(II)    terrorism;
(III)   assassination;
(IV)    war;
(V)     gaming; or
(VI)    other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.

*Id.* § 7a-2(c)(5)(C)(i); *see* 17 C.F.R. § 40.11.  No such contract "determined by the Commission to be contrary to the public interest" may be listed on a DCM.  7 U.S.C. § 7a-2(c)(5)(C)(ii).  Absent an adverse public-interest determination, however, Congress did not bar event contracts involving the Special Rule's enumerated activities.

14

43.     The CEA also includes a number of provisions that expressly address the states' regulatory and enforcement powers.  Most notably, immediately after Section 2(a) grants the CFTC "exclusive jurisdiction" over derivatives trading "on a contract market designated pursuant to" 7 U.S.C. § 7, the statute provides that "*[e]xcept as hereinabove provided*, nothing contained in this section shall . . . supersede or limit the jurisdiction . . . of any State."  7 U.S.C. § 2(a)(1)(A). The clear implication is that the CEA "supersede[s]" state authority regarding trading on DCMs, but not off.

44.     Both the "exclusive jurisdiction" provision and this savings clause were introduced to the statute in 1974 after decades of debate about whether and to what extent states should be able to apply their laws—including their gambling laws—to trading on DCMs.  When the CEA was first enacted in 1936, states often attempted to apply their gaming laws to trading on designated markets, and the Supreme Court interpreted some of the language in the original CEA to authorize this practice to continue, thereby permitting concurrent state and federal regulation of derivatives markets.  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 670-693 (1982).

45.     By 1974, however, Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction."  *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong. 128 (1974).  Congress therefore both eliminated the language the Supreme Court had interpreted to allow concurrent jurisdiction and added the "exclusive jurisdiction" provision.  S. Rep. No. 93-1131, at 31 (1974).  Moreover, when the House tried to soften the exclusive-jurisdiction provision by adding the savings clause, the Senate insisted on amending that clause to ensure it applied only "except as hereinabove provided."  *Id.*  The language ensured that "where

15

the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23.

46.     Other provisions of the CEA that address the states similarly protect the CFTC's exclusive authority to regulate trading on DCMs, while preserving states' authority to regulate most off-DCM transactions.  For example, in 1978, Congress added Section 13a-2, entitled "Jurisdiction of States."  That section provides states with some ability to bring suits to enforce the CEA against entities "*other than a contract market*" or other designated trading facility, as well as preserving the states' authority to bring state court proceedings regarding "general civil or criminal antifraud" laws.  7 U.S.C. §§ 13a-2(1), (7) (emphasis added).  Similarly, in 1982, Congress added what is now Section 16(e)(1).  That provision reiterates that the CEA generally does not preempt other federal or state laws for transactions "not conducted on or subject to the rules of a registered entity," such as a DCM.  *Id.* § 16(e)(1)(B)(i).  Section 16(e)(2), added in 2000, goes on to establish certain narrow circumstances in which state "gaming" and "bucket shop[ ]" laws are preempted even with respect to off-DCM transactions.  *Id.* § 16(e)(2).

47.     The CEA thus sets out a highly reticulated federal scheme for regulating event contracts and other derivatives traded on DCMs like Kalshi, and it grants the CFTC "exclusive jurisdiction" over event contracts while preserving state authority to regulate transactions that occur outside of a DCM.

48.     Congress confirmed the same understanding in the Unlawful Internet Gambling Enforcement Act of 2006 ("UIGEA").  Although UIGEA generally prohibits the use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), Congress provided that the term "bet or wager" "does not include" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E)(ii).  UIGEA thus

16

underscores Congress's understanding that state gaming laws do not reach trading on DCMs. *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-6162, 2025 WL 3141202, at *6 (N.D. Cal. Nov. 10, 2025) (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling'").

49.     In 2020, the CFTC designated Kalshi as a contract market, affirming that its trading platform complies with the CEA. *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *4 (D.D.C. Sep. 12, 2024). Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

50.     Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

51.     Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports. For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q2 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. Kalshi also offers contracts on congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

52.     Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations. *See* 7 U.S.C. § 7a-2(c)(1). Those certifications contain extensive

information, including in confidential appendices not available to the public, for the CFTC's review.

53.     The CFTC also has the ability to require Kalshi to submit a "Demonstration of [C]ompliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request."  17 C.F.R. § 38.5(b).

54.     The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs.  *Orgel*, 2026 WL 474869, at *5.  The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, exactly as other derivatives contracts are listed, traded, and closed on the DCMs the CFTC oversees.

55.     The CFTC has repeatedly confirmed that Kalshi's contracts—including its sports event contracts—fall within the CFTC's exclusive regulatory jurisdiction.  In addition to its recent NPRM regarding sports event contracts, the CFTC has filed amicus briefs making clear that "the transactions conducted on a CFTC-registered DCM qualify as swaps under the CEA" and that "the CEA expressly bars state laws from regulating or prohibiting these transactions that are conducted on CFTC-regulated DCM."  Amicus Br. of CFTC at 1, 20, 26, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br.").  It has also brought lawsuits against eight other states that have sought to subject DCMs to state gambling laws,[16] and

---

[16] *See generally* Compl., *United States v. Arizona*, No. 2:26-cv-2246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. Connecticut*, No. 3:26-cv-498 (D. Conn. Apr. 2, 2026), Dkt. No.

has obtained a preliminary injunction against state enforcement in the U.S. District Court for the District of Arizona. *Johnson*, 2026 WL 1223373, at *9 (enjoining state enforcement action against exchange because exchange and CFTC "are likely to prevail on their claim that the CEA's grant of 'exclusive jurisdiction' preempts the State's enforcement of its gambling laws against DCM operators offering event contracts"). And, as discussed above, it has brought an action challenging the State's efforts to regulate DCMs under SB 3019 and other existing laws. Ill. Am. Compl.

### C. The CFTC Recently Announced A Detailed Regulatory Framework Governing Sports Events Contracts on DCMs.

56. In June 2026, the CFTC issued a 267-page Notice of Proposed Rulemaking ("NPRM") underscoring its exclusive jurisdiction over prediction markets—and sports event contracts traded on those markets. Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806 (June 12, 2026) (to be codified at 17 C.F.R. pt. 40). The NPRM confirms that the CEA "expressly preempts state laws" with respect to event contracts on DCMs. *Id.* at 35,808. It underscores that event contracts are "swaps" that serve "price discovery" functions and "allow market participants to hedge exposure to a wide array of events for which no traditional financial instrument otherwise exists," including "sporting events" that "generate billions of dollars in economic activity and materially affect both regional and national markets." *Id.* at 35,807-08 (citation modified).

57. The NPRM then proposes detailed regulations implementing the Special Rule's grant of authority to the CFTC to decide when "gaming" event contracts are "contrary to the public

---

1; Compl., *United States v. New York*, No. 1:26-cv-3404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1; Compl., *United States v. Wisconsin*, No. 2:26-cv-749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1; Compl., *United States v. Minnesota*, No. 0:26-cv-2661 (D. Minn. May 19, 2026), Dkt. No. 1; Proposed Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 1:26-cv-327 (D.R.I. May 28, 2026), Dkt. No. 19-1; Compl., *United States v. New Mexico*, No. 1:26-cv-1912 (D.N.M. June 12, 2026), Dkt. No. 1; Compl., *United States v. Kentucky*, No. 3:26-cv-49 (E.D. Ky. June 23, 2026), Dkt. No. 1.

interest." 7 U.S.C. § 7a-2(c)(5)(C). Those regulations (1) define "gaming" to include sports-event contracts, (2) make clear that sports-event contracts are *not* (and never have been) categorically prohibited, but instead are subject to case-by-case public-interest review, (3) provide a framework for the CFTC to evaluate whether event contracts comport with the public interest, and (4) explain that the CFTC "aims to permit contracts settled on aggregate sports outcomes with objective data and integrity infrastructure" and that many sports-event contracts "can be operated consistent with the public interest." NPRM at 35,853, 35,836. The comment period on the NPRM closes on July 27, 2026. *Id.* at 35,806.

### D. Illinois's SB 3019 Improperly Regulates Commodities Subject to the Exclusive Jurisdiction of the CFTC.

58.     Just one week after the CFTC announced its regulatory framework for trading sports event contracts on DCMs, Illinois enacted SB 3019, which purports to establish its own distinct state regulatory regime for exchange-traded sports event contracts. As a result, Kalshi is now barred from offering sports event contracts on its exchanges unless it submits to Illinois's costly and intrusive licensing and regulatory regime—even though its exclusive federal regulator recently confirmed that offering those contracts is fully authorized by federal law.

59.     Illinois's new law, SB 3019, was introduced to the state senate on January 29, 2026, and assigned to the Financial Institutions Committee on March 10, 2026. *See* S.B. 3019, 104th Gen. Assemb. (Ill. 2026), https://perma.cc/AU57-5JPZ.

60.     The bill was subsequently moved to the House where the legislature held conferences on it throughout May and June before the bill became part of an omnibus tax and revenue bill, which was passed by both Houses on June 1, 2026. *See, e.g.*, *id.*

61.     On June 16, 2026, Defendant Governor Pritzker signed SB 3019 into law; SB 3019 becomes effective on July 1, 2026. *See id.*

20

62. SB 3019 makes it unlawful to offer sports event contracts on a DCM in Illinois without obtaining a state gambling license—at a cost of millions of dollars—and submitting to a host of state regulations. The law amends the definition of "sports wagering" to include transactions "tied to a sporting contest or sporting event" that are "offered, traded, or executed on a *prediction market or exchange*." SB 3019 Art. 130; 230 ILCS 45/25-10 (emphasis added). "Sports wagering," in turn, is subject to a host of restrictions under Illinois law. For example, sports wagering is prohibited in Illinois "unless all necessary licenses have been obtained in accordance with this Act and the rules of the Board and the Department." *Id.* 45/25-20. SB 3019 thus creates a requirement that DCMs like Kalshi pay millions of dollars to obtain a state license to continue offering sports event contracts in the State, irrespective of their status as a federally regulated exchange.

63. Compliance with Illinois's costly licensing regime is just one requirement SB 3019 purports to subject Kalshi to; it would also require Kalshi to adhere to a laundry list of other regulations, such as only being permitted to "accept a wager from a person physically located in the State," 230 ILCS 45/25-25(e), and age requirements, *id.* 45/25-25(b).

64. Failure to comply with the licensing and regulatory provisions exposes Kalshi to criminal liability, including felony charges. *See, e.g.*, 720 ILCS 5/28-1.1 ("bookmaking," defined as collecting more than five wagers a day, is a felony offense); 230 ILCS 10/18 (listing misdemeanor and felony charges where a person engages in gambling without a license).

65. Thus, when the law takes effect on July 1, 2026, Kalshi may be subject to civil and criminal penalties merely for operating its federal derivatives exchange in accordance with the requirements of its exclusive federal regulator.

66. SB 3019 is no more than a targeted attack on federal DCMs, as the Illinois Gaming Board has made clear that it believes Kalshi and other DCMs are "engaged in illegal gambling" because "[p]rediction markets constitute gambling activity under Illinois law." Ill. Gaming Bd., *Re: Prediction Markets* (Oct. 23, 2025), https://perma.cc/48HG-ZMAE.

67. Moreover, even before the enactment of SB 3019, Illinois officials had signaled their view that—despite the CEA's exclusive jurisdiction provision—*states* should have the exclusive authority to regulate event contracts on DCMs.

68. Last year, the Defendants issued a Cease and Desist Letter to Kalshi that plainly stated the State's belief that Kalshi was violating Illinois laws, and that Kalshi was required to cease operations in the State or risk "civil or criminal penalties." Ex. 1. After the State issued the C&D Letter, Kalshi contacted the office of the Illinois Attorney General to engage in good faith discussions about Kalshi's continued operations in the State. Kalshi and the AG's office consented to a nonenforcement agreement under which the State would abstain from bringing any actions against Kalshi until the resolution of a preliminary injunction motion pending in a case that considers similar preemption issues. *See Coinbase Fin. Mkts., Inc. v. Raoul*, No. 1:25-cv-15406 (N.D. Ill.). The parties further agreed that the State would refrain from bringing an action against Kalshi without providing prior notice. Ex. 2. That agreement, however, plainly did not contemplate the passage of a new state law specifically targeting sports event contracts traded on DCMs like Kalshi, which creates a new, grave risk of imminent enforcement.

69. Additionally, Defendant Attorney General Raoul recently signed a letter to CFTC Chairman Michael Selig that challenged the CFTC's authority, pursuant to federal law, over sports event contracts. Dave Yost et al., Comment Letter on Prediction Markets (Apr. 30, 2026), https://perma.cc/DW4F-ZCYX. In that letter, the Defendant stated that "the CFTC lacks exclusive

22

jurisdiction" over sports events contracts and that the CFTC should reject its own authority in favor of letting states regulate sports events contracts. *Id.* at 1.

70.    Illinois officials have also consistently supported other states' efforts to regulate Kalshi and other DCMs, in contravention of federal law, by signing amicus briefs in the United States Court of Appeals for the Third Circuit on June 17, 2025, the Fourth Circuit on December 22, 2025, and in the Ninth Circuit on January 30, 2026, and March 10, 2026, which claim that Kalshi is violating comparable state laws.[17]  Those amicus briefs argue that states, not just the CFTC, have the power to regulate Kalshi's sports event contracts, and that such contracts constitute illegal sports gambling under the signatory states' laws.

71.    Illinois' SB 3019 is therefore simply the latest—and most extreme—step in its campaign to intrude upon the CFTC's exclusive jurisdiction over sports event contracts traded on DCMs.

**E.      Illinois's Unlawful Efforts to Regulate Event Contracts Traded on DCMs Directly Harm Kalshi, A Federally Regulated DCM That Lawfully Offers Event Contracts.**

72.    As explained above, Kalshi is a federally regulated exchange that the CFTC designated as a contract market in 2020 and has since remained subject to the Agency's exclusive jurisdiction.  *See supra* ¶¶ 49-55.

73.    The State's newly enacted legislation purports to prohibit Kalshi from offering the sports events contracts that it currently offers pursuant to federal law and under the supervision of

---

[17] *See generally* Br. of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29; Br. of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41; Br. of Amici Curiae, *KalshiEX LLC v. Assad*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1; Br. of Amici Curiae, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1.

the CFTC unless Kalshi complies with the State's unconstitutional licensing and regulatory regime.

74. Kalshi faces profound harms: Complying with Illinois's law would bring Kalshi *out* of compliance with federal law, as the CFTC's longstanding regulations require "impartial access," meaning that Kalshi is forbidden from discriminating against its customers based on geography. 17 C.F.R. § 38.151(b); CFTC Br. 26-27. Whether Kalshi complies with the Illinois law by ceasing to offer sports event contracts or by offering them in accordance with Illinois's "in-state only" rule, it will inevitably violate the "impartial access" rule by restricting access based on geography. Moreover, restricting access will be costly and burdensome, and will threaten Kalshi's relationship with its customers and the public. This is so even if Kalshi were to attempt to adhere to the full range of Illinois gaming laws SB 3019 subjects it to, as there is no guarantee that its application would be granted at all, 230 ILCS 45/25-45(h)—let alone by July 1, 2026.

75. On the other hand, if Kalshi refuses to comply with the Illinois law, it could face *criminal* charges that would inflict irreparable harm on the company and its reputation.

76. When the new law goes into effect on July 1, Kalshi will therefore face an impossible choice: comply with the preempted state law—*either* by ceasing to offer its fully lawful event contracts in Illinois *or* by attempting to adhere to the full range of Illinois gaming laws, including by seeking the requisite licenses (subject to the permission of the IGB) and paying exorbitant associated licensing fees—or risk criminal penalties.

77. SB 3019 will go into effect July 1, meaning there is an imminent threat of enforcement given that Kalshi and other DCMs must comply with a regulatory scheme it was not previously subject to in a matter of weeks. Kalshi, moreover, is already profoundly harmed from the legislation. The law brands Kalshi as a felon in the eyes of Illinois merely for engaging in

24

lawful conduct, which by itself inflicts severe reputational harms. And in order to comply with SB 3019 by its effective date, Kalshi would need to start taking steps now to accommodate Illinois's unlawful commands.

## REQUISITES FOR RELIEF

78.     As a result of Defendants' threatened conduct and Illinois's existing laws and newly enacted SB 3019 described above, there is a strong likelihood that Defendants will take action, including, but not limited to, seeking to enforce preempted state law in violation of the Supremacy Clause of the U.S. Constitution, which will subject Kalshi and its customers to irreparable harm.

79.     An actual and substantial controversy exists between Plaintiff and Defendants as to their respective legal rights and duties. Defendants' conduct alleged herein, including threats to Kalshi, has already resulted in, and will continue to result in, irreparable injury to Kalshi, including but not limited to economic hardship, lost business opportunities, and impairment of existing contractual relationships.

80.     Kalshi has no plain, speedy, or adequate remedy at law to address the wrongs described herein. Kalshi therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Illinois law that interferes with the operation and function of Kalshi's DCM and Kalshi's advertising and promotion of its lawful products described herein.

## COUNT I

### (Supremacy Clause—Preemption by Commodity Exchange Act)

81.     Plaintiff incorporates all prior paragraphs by reference.

82.     The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

83.     The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

84.     Congress expressly preempted state law by giving the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges, including the trading of event contracts on DCMs like Kalshi.  7 U.S.C. § 2(a)(1)(A).

85.     Through the passage of SB 3019 and its likely enforcement, Defendants are impermissibly intruding on the CFTC's "exclusive jurisdiction" to regulate derivatives trading on CFTC-regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter.  Yet Defendants' newly enacted statute specifically targets event contracts involving "gaming" by barring DCMs from offering sports event contracts unless the exchange submits to a costly and burdensome state licensing and regulatory regime.  Such state efforts to regulate contracts within the CFTC's "exclusive jurisdiction" are expressly preempted by the CEA.

86.     In addition, federal law occupies the entire field of regulating trading on designated contract markets, and Defendants' newly enacted law and its enforcement are both expressly and impliedly field-preempted under the Supremacy Clause.  As the Third Circuit recently held in concluding that state laws are field preempted, the CEA's text "preempts state laws that directly interfere with swaps traded on DCMs," and because Kalshi's event contracts are swaps traded on a CFTC-licensed DCM, "the CFTC has exclusive jurisdiction." *Flaherty*, 172 F.4th at 225-226.

26

87. SB 3019 is also preempted because it conflicts with federal law and policy. The legislation expressly bans sports event contracts that federal law and the CFTC have authorized unless the DCM offering those contracts submits to the state-specific licensing and regulatory regime. Doing so would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges. Congress passed the 1974 amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992). "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit thus explained that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation omitted). Illinois's law not only affects markets under the jurisdiction of the CFTC, but broadly prohibits the very conduct that federal law permits on CFTC-designated exchanges. *See* 720 ILCS 5/28-1(b).

88. This conflict with the CEA is even clearer when considering that 49 other states and the District of Columbia might similarly attempt to subject Kalshi to their own state laws, producing the patchwork of state-by-state regulation Congress sought to prevent. As the Third Circuit recently held, state regulation of Kalshi's event contracts "would create an obstacle to executing the [CEA] because such state enforcement would prohibit Kalshi, which operates a licensed DCM under the exclusive jurisdiction of the CFTC, from offering its sports-related event contracts," resulting in "exactly the patchwork that Congress replaced wholecloth by creating the CFTC." *Flaherty*, 172 F.4th at 230.

27

89.      Additionally, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law adopts a different method of enforcement, *Ind. Bell Tel. Co. v. Ind. Util. Regul. Comm'n.*, 359 F.3d 493, 497 (7th Cir. 2004), that hampers "the careful balance struck by Congress," *Arizona v. United States*, 567 U.S. 387, 406 (2012).  Where Congress grants a federal agency broad enforcement discretion, a state regime that allows for state prosecutions of the same actions frustrates the congressional scheme.  *See Am. Agric.*, 977 F.2d at 1155-57 (holding that where Congress vested the CFTC with exclusive regulatory authority, permitting state law claims would "frustrate Congress' intent to bring the markets under a uniform set of regulations").  Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts for trading by self-certifying that these contracts comported with federal law.  The CFTC had the authority to review that self-certification if it concluded Kalshi's contracts fell within a category enumerated in the Special Rule and were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i) but chose not to do so.  The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, it chose not to do so.  Congress thus gave the CFTC a variety of tools for enforcing federal law against federally designated contract markets and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate.  Subjecting federally regulated exchanges to state laws like Illinois's would "stand[ ] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Am. Agric.,* 977 F.2d at 1156-57.

90.      Furthermore, Defendants' newly enacted law and their enforcement of it conflict with the CFTC Core Principles on which Kalshi's designation as a CFTC-approved market

depends. The CFTC's Core Principle 2 requires Kalshi to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. §§ 38.150, 38.151(b) (emphasis added). If Kalshi is forced to cease offering sports event contracts to Illinois residents (or to offer them *only* to Illinois residents), it will inevitably violate that "impartial access" requirement because, as the CFTC itself has recognized, "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide." Mot. for Prelim. Inj. at 18, *KalshiEX LLC v. Johnson*, No. 2:26-cv-1715 (D. Ariz. Apr. 8, 2026), Dkt. No. 49 (emphasis added). In addition, Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of price distortions and *market disruptions*." 17 C.F.R. § 38.255 (emphasis added). Abruptly closing Kalshi's event contracts to some users based on geography would constitute exactly the sort of market disruption the CFTC has directed Kalshi to prevent. Depending on the CFTC's interpretation of its Core Principles, it could well be that Kalshi's "compliance with both federal and state regulations is a physical impossibility"—the paradigmatic case for preemption. *Iowa Migrant Mvmt. for Just. v. Bird*, 157 F.4th 904, 919 (8th Cir. 2025) (citation omitted).

91. Defendants may not enforce Illinois's newly enacted law SB 3019, or any related anti-gambling laws including 230 ILCS 45/25-20 *et seq.*, against Kalshi because Kalshi is a federally regulated exchange that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*, and SB 3019 expressly infringes upon that exclusive oversight.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and against Defendants as follows:

1.      Enter a judgment declaring that the use of 230 ILCS 45/25-20 *et seq.*, including as amended and adopted by SB 3019, or any related state laws, in a manner to effectively regulate Plaintiff's designated contract market violates the Supremacy Clause of the United States Constitution as applied to Plaintiff and its affiliates, and a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

2.      Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing 230 ILCS 45/25-20 *et seq.*, as amended by SB 3019, or any other Illinois law that attempts to effectively regulate Plaintiff's exchange, against Plaintiff and its affiliates;

3.      Enter a temporary restraining order, preliminary injunction, and permanent injunction prohibiting Defendants, their officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the injunction, from enforcing SB 3019, including 230 ILCS 45/25-10 and 45/25-20, against Plaintiff and its affiliates;

4.      Any other relief within this Court's discretion that it deems just and proper.

30

DATED: June 23 2026.

Respectfully submitted,


/s/ *Thadford A. Felton*
Thadford A. Felton (IL ARDC No. 6224896)
tfelton@ubglaw.com
Susan Meyer (IL ARDC No. 6226450)
smeyer@ubglaw.com
**UB GREENSFELDER LLP**
200 West Madison | Suite 3300
Chicago, IL 60606
Telephone: 312-658-6500

and

Neal Kumar Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
Colleen E. Roh Sinzdak (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
Anastasia Pastan (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586


Jed M. Schwartz (*pro hac vice* forthcoming)
Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
Matthew J. Laroche (*pro hac vice* forthcoming)
Katherine Kelly Fell (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*

31