**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| THE UNITED STATES OF AMERICA and COMMODITY FUTURES TRADING COMMISSION,<br><br>    Plaintiffs,<br><br>COALITION FOR FAIR MARKETS and NORTH AMERICAN DERIVATIVES EXCHANGE, INC., d/b/a OG,<br><br>    Intervenors,<br><br>v.<br><br>STATE OF ILLINOIS et al.,<br><br>    Defendants. | No. 26 C 3659<br><br>Honorable Martha M. Pacold |
| KALSHIEX LLC,<br><br>    Plaintiff,<br><br>v.<br><br>KWAME RAOUL, in his official capacity as Attorney General of Illinois, et al.,<br><br>    Defendants. | No. 26 C 7363<br><br>Honorable Martha M. Pacold |

**DEFENDANTS' COMBINED RESPONSE IN OPPOSITION
TO THE CFTC'S, KALSHI'S, AND THE COALITION'S
<u>MOTIONS FOR PRELIMINARY INJUNCTIONS</u>**

KWAME RAOUL
Illinois Attorney General

Darren Kinkead
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

LEGAL STANDARD ......................................................................................................... 2

ARGUMENT ....................................................................................................................... 3

I.      Plaintiffs are unlikely to succeed on the merits of their preemption claims. ...................... 3

      A.      Sports and election event contracts are not "swaps." ............................................. 3

            1.      These contracts do not depend on the occurrence of an "event." ............... 5

            2.      These contracts are not "associated with" economic consequences. ......... 10

      B.      Congress did not intend to displace state gaming laws ......................................... 16

            1.      Section 2(a)(1)(A) enacts ordinary conflict preemption principles. ......... 17

            2.      *American Agriculture* necessarily rejects express preemption. ................ 19

            3.      *American Agriculture* also forecloses field preemption ............................ 22

            4.      Illinois gaming laws are not an obstacle to Congress's objectives. .......... 23

      C.      Congress does not "hide elephants in mouseholes." ............................................. 27

II.     Plaintiffs have not established that they are suffering any irreparable harm. ................... 29

III.    The public interest and balance of equities do not support preliminary relief ................. 31

CONCLUSION .................................................................................................................... 32

ii

## TABLE OF AUTHORITIES

**Cases**

*Ah Sin v. Wittman*,
198 U.S. 500 (1905)..................................................................................................... 23

*Alabama Association of Realtors v. Department of Health & Human Services*,
594 U.S. 758 (2021)..................................................................................................... 28

*American Academy of Pediatrics v. Uthmeier*,
178 F.4th 1113 (7th Cir. 2026) .................................................................................... 30

*American Agriculture Movement, Inc. v. The Board of Trade of the City of Chicago*,
977 F.2d 1147 (7th Cir. 1992) .................................................................. 17, 18, 19, 22, 23

*Arizona v. United States*,
567 U.S. 387 (2012)............................................................................................ 23, 25, 26

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015)..................................................................................................... 22

*Beecham v. United States*,
511 U.S. 368 (1994)..................................................................................................... 14

*Biden v. Nebraska*,
600 U.S. 477 (2023)..................................................................................................... 15

*Bond v. United States*,
572 U.S. 844 (2014).......................................................................................... 12, 16, 28

*Bostock v. Clayton County*,
590 U.S. 644 (2020)....................................................................................................... 5

*Cabell v. Markham*,
148 F.2d 737 (2d Cir. 1945) ........................................................................................ 15

*California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*,
519 U.S. 316 (1997)..................................................................................................... 13

*Cassell v. Snyders*,
990 F.3d 539 (7th Cir. 2021)........................................................................................ 29

*Chamber of Commerce v. Whiting*,
563 U.S. 582 (2011)..................................................................................................... 19

iii

*Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*,
    162 F.4th 631 (6th Cir. 2025) ............................................................................ 27

*Cipollone v. Liggett Group, Inc.*,
    505 U.S. 504 (1992) ......................................................................................... 20

*Conti v. Citizens Bank, N.A.*,
    157 F.4th 10 (1st Cir. 2025) ............................................................................ 25

*Davis v. Michigan Department of Treasury*,
    489 U.S. 803 (1989) ......................................................................................... 22

*Dawson v. Steager*,
    586 U.S. 171 (2019) ......................................................................................... 22

*Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety & Homeland*
    *Security*, 108 F.4th 194 (3d Cir. 2024) ........................................................... 31

*Delligatti v. United States*,
    604 U.S. 423 (2025) .................................................................................... 4, 12

*Department of Commerce v. New York*,
    588 U.S. 752 (2019) ........................................................................................... 1

*Digital Realty Trust, Inc. v. Somers*,
    583 U.S. 149 (2018) ......................................................................................... 15

*Dubin v. United States*,
    599 U.S. 110 (2023) ......................................................................................... 11

*East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*,
    414 F.3d 700 (7th Cir. 2005) ........................................................................... 30

*Edwards v. Aguillard*,
    482 U.S. 578 (1987) ......................................................................................... 15

*Effex Capital, LLC v. National Futures Association*,
    933 F.3d 882 (7th Cir. 2019) ........................................................... 17, 19, 22, 29

*English v. General Electric Co.*,
    496 U.S. 72 (1990) ........................................................................................... 26

*FCC v. Consumers' Research*,
    606 U.S. 656 (2025) ......................................................................................... 29

*Fischer v. United States*,
603 U.S. 480 (2024)...........................................................................................21

*FTC v. Ken Roberts Co.*,
276 F.3d 583 (D.C. Cir. 2001) ..........................................................................21

*Gamble v. United States*,
587 U.S. 678 (2019)...........................................................................................25

*Greater New Orleans Broadcasting Association, Inc. v. United States*,
527 U.S. 173 (1999)...........................................................................................12

*Haaland v. Brackeen*,
599 U.S. 255 (2023)...........................................................................................21

*Hines v. Davidowitz*,
312 U.S. 52 (1941).............................................................................................18

*Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Co.*,
582 F.3d 721 (7th Cir. 2009) ............................................................................16

*Investment Company Institute v. CFTC*,
720 F.3d 370 (D.C. Cir. 2013) ...........................................................................3

*Investment Company Institute v. CFTC*,
891 F. Supp. 2d 162 (D.D.C. 2012) ..................................................................12

*KalshiEX LLC v. Flaherty*,
172 F.4th 220 (3d Cir. 2026)........................................................................7, 14

*KalshiEX LLC v. Hendrick*,
817 F. Supp. 3d 1014 (D. Nev. 2025) ....................................... 11, 12, 13, 14, 16

*KalshiEX LLC v. Martin*,
793 F. Supp. 3d 667 (D. Md. 2025) ...................................................... 21, 25, 29

*KalshiEX LLC v. Orgel*,
No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026) ................. 10

*KalshiEX LLC v. Schuler*,
No. 26-3196, 2026 WL 1295806 (6th Cir. Apr. 24, 2026).............. 20, 22, 23, 26

*KalshiEX LLC v. Schuler*,
No. 2:25-cv-1165, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026) .......... 13, 20, 25, 29

*KalshiEX LLC v. Williams*,
No. 25 Civ. 8846 (AT), 2026 WL 2017466 (S.D.N.Y. July 13, 2026).................. 25, 27, 31

*Kansas v. Garcia*,
589 U.S. 191 (2020)...................................................................................... 22

*Kentucky v. Graham*,
473 U.S. 159 (1985)...................................................................................... 30

*Kerr v. First Commodity Corp. of Boston*,
735 F.2d 281 (8th Cir. 1984) ........................................................................ 20

*Kerwin ex rel. NLRB v. Trinity Health Grand Haven Hospital*,
174 F.4th 942 (6th Cir. 2026) ....................................................................... 31

*King v. Burwell*,
576 U.S. 473 (2015)...................................................................................... 28

*Kurns v. Railroad Friction Products Corp.*,
565 U.S. 625 (2012)...................................................................................... 22

*Learning Resources, Inc. v. Trump*,
607 U.S. 229 (2026)...................................................................................... 28

*Maine Forest Products Council v. Cormier*,
51 F.4th 1 (1st Cir. 2022) ............................................................................. 26

*Maracich v. Spears*,
570 U.S. 48 (2013)........................................................................................ 11

*Maryland v. King*,
567 U.S. 1301 (2012).................................................................................... 31

*McHenry County v. Raoul*,
44 F.4th 581 (7th Cir 2022).............................................................. 23, 25, 27

*Michigan v. Army Corps of Engineers*,
667 F.3d 765 (7th Cir. 2011) ........................................................................ 30

*Minocqua Brewing Company LLC v. Hess*,
160 F.4th 849 (7th Cir. 2025)......................................................................... 2

*MITE Corp. v. Dixon*,
633 F.2d 486 (7th Cir. 1980)......................................................................... 25

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)..................................................................................... 30

*Moskal v. United States*,
498 U.S. 103 (1990)....................................................................................... 6

*Mullin v. Doe*,
No. 25-1083, 2026 WL 1825840 (U.S. June 25, 2026) ...................................... 3

*Murphy v. NCAA*,
584 U.S. 453 (2018).......................................................................... 2, 4, 15, 32

*Murphy v. Smith*,
583 U.S. 220 (2018)..................................................................................... 17

*Nelson v. Great Lakes Educational Loan Services, Inc.*,
928 F.3d 639 (7th Cir. 2019)......................................................................... 23

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*,
514 U.S. 645 (1995)..................................................................................... 11

*New York State Department of Social Services v. Dublino*,
413 U.S. 405 (1973)..................................................................................... 23

*Nken v. Holder*,
556 U.S. 418 (2009)..................................................................................... 32

*North American Derivatives Exchange, Inc. v. Nevada*,
815 F. Supp. 3d 1169 (D. Nev. 2025)....................................... 5, 6, 7, 9, 29, 32

*Patriotic Veterans, Inc. v. Indiana*,
736 F.3d 1041 (7th Cir. 2013) ...................................................................... 20

*Protect Our Parks, Inc. v. Buttigieg*,
39 F.4th 389 (7th Cir. 2022)........................................................................... 2

*Pulsifer v. United States*,
601 U.S. 124 (2024)..................................................................................... 20

*QCX LLC v. Nessel*, No. 1:26-cv-710,
2026 WL 1895958 (W.D. Mich. June 17, 2026)........... 6, 11, 12, 13, 14, 16, 22, 23, 29, 31

*R.J. Hereley & Son Co. v. Stotler & Co.*,
466 F. Supp. 345 (N.D. Ill. 1979) ................................................................. 21

*Rosemont v. Jaffe,*
 482 F.3d 926 (7th Cir. 2007) ................................................................... 28

*Slaney v. The International Amateur Athletic Federation,*
 244 F.3d 580 (7th Cir. 2001) ................................................................... 21

*Snyder v. United States,*
 603 U.S. 1 (2024) ..................................................................................... 14

*South Branch LLC v. Commonwealth Edison Co.,*
 46 F.4th 646 (7th Cir. 2022) .................................................................... 28

*Starbucks Corp. v. McKinney,*
 602 U.S. 339 (2024) ................................................................................... 2

*Stenberg v. Carhart,*
 530 U.S. 914 (2000) ................................................................................... 4

*Sturgeon v. Frost,*
 587 U.S. 28 (2019) ................................................................................... 24

*Susan B. Anthony List v. Driehaus,*
 573 U.S. 149 (2014) ................................................................................... 3

*Taniguchi v. Kan Pacific Saipan, Ltd.,*
 566 U.S. 560 (2012) ............................................................................ 6, 10

*Texas v. Department of Homeland Security,*
 123 F.4th 186 (5th Cir. 2024) .................................................................. 27

*Thrifty Oil Co. v. Bank of America National Trust & Saving Association,*
 322 F.3d 1039 (9th Cir. 2003) ................................................................... 3

*Transcontinental Gas Pipe Line Co., LLC v. Pennsylvania Environmental Hearing Board,*
 108 F.4th 144 (3d Cir. 2024) .................................................................... 21

*Turek v. General Mills, Inc.,*
 662 F.3d 423 (7th Cir. 2011) ................................................................... 21

*United States v. Cook County,*
 167 F.3d 381 (7th Cir. 1999) ................................................................... 22

*United States v. Costello,*
 666 F.3d 1040 (7th Cir. 2012) ......................................................... 7, 10, 15

*United States v. Illinois*,
795 F. Supp. 3d 1057 (N.D. Ill. 2025) ................................................................ 18

*United States v. King*,
834 F.2d 109 (6th Cir. 1987) .................................................................... 1, 28

*United States v. Lopez*,
514 U.S. 549 (1995) ................................................................................. 11

*United States v. Miller*,
604 U.S. 518 (2025) ................................................................................. 11

*United States v. Phillips*,
155 F.4th 102 (2d Cir. 2025) .......................................................... 3, 12, 15

*United States v. Skoien*,
614 F.3d 638 (7th Cir. 2010) .................................................................. 19

*United States v. Smith*,
997 F.3d 215 (5th Cir. 2021) ..................................................................... 6

*West Virginia v. EPA*,
597 U.S. 697 (2022) ................................................................................. 28

*Whitman v. American Trucking Associations*,
531 U.S. 457 (2001) ................................................................................. 27

*WV Association of Club Owners & Fraternal Services, Inc. v. Musgrave*,
553 F.3d 292 (4th Cir. 2009) .................................................................. 23

*Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*,
134 F.4th 326 (5th Cir. 2025) ................................................................. 25

**Statutes**

4 U.S.C. § 111 ........................................................................................... 22

7 U.S.C. § 1a ....................................................................... 4, 5, 6, 9, 10, 12, 14

7 U.S.C. § 2 ............................................................................................. 3, 17

7 U.S.C. § 7a-2 ..................................................................................... 14, 23, 24

7 U.S.C. § 16 ............................................................................................. 20

15 U.S.C. § 8302 ......................................................................................... 29

15 U.S.C. § 8321 ........... 29

230 ILCS 45/25-10 ........... 30

230 ILCS 45/25-20 ........... 25

230 ILCS 45/25-25 ........... 26

230 ILCS 45/25-45 ........... 32

230 ILCS 45/25-90 ........... 25, 30

230 ILCS 45/25-100 ........... 32

720 ILCS 5/28-1 ........... 24

**Regulations**

17 C.F.R. § 38.151 ........... 26

17 C.F.R. § 40.11 ........... 24

11 Ill. Admin. Code 1900.1130 ........... 32

**Other Authorities**

156 Cong. Rec. S5906 (daily ed. July 15, 2010) ........... 24

BLACK'S LAW DICTIONARY (12th ed. 2024) ........... 11, 13, 26

Jonathan D. Cohen, "Most Americans see prediction markets as more like gambling than investing, new AIBM/Ipsos poll finds," *American Institute for Boys and Men* (Mar. 17, 2026), aibm.org/research/most-americans-see-prediction-markets-as-more-like-gambling-than-investing-new-aibm-ipsos-poll-finds/ ........... 1

Illinois Gaming Board, Annual Report (2025) ........... 28

Illinois Gaming Board, Final Order (February 6, 2025) ........... 27

Illinois Public Act 101-31 ........... 30

Illinois Public Act 104-468 ........... 30

Brad Lipton & Toyosi Odusola, "Since Kalshi's Launch, Ordinary Users Have Lost Half a Billion Dollars," *Roosevelt Institute* (July 7, 2026), rooseveltinstitute.org/blog/since-kalshis-launch-ordinary-users-have-lost-half-a-billion-dollars/ ........... 2

Multi-State Internet Gaming Agreement ........................................................................ 26

OXFORD ENGLISH DICTIONARY (rev. ed. 2018) ................................................................ 5

Mark Prussin & Ali Bauman, "Brad Lander defeats Rep. Dan Goldman in NY-10
     Democratic primary," *CBS News* (June 24, 2026), cbsnews.com/newyork/news/dan-
     goldman-brad-lander-nyc-democratic-primary-results/...................................................... 7

Public Law 111-203, § 721 ............................................................................................. 15

Tim Reynolds, "The Spurs are still believers, but it's the Knicks who are 1 game from
     winning the NBA title," *Associated Press* (June 11, 2026), apnews.com/article/nba-
     finals-spurs-knicks-5f5cd598f458de6f8492d802539eb7ee................................................ 7

SCALIA & GARNER, READING LAW (2012) ...................................................................... 12

Senate Report 111-176..................................................................................................... 15

Dave Smith, "A Number of Changes," *National Baseball Hall of Fame*, baseballhall.org/
     discover-more/stories/baseball-history/changing-nature-of-statistics ................................. 9

**INTRODUCTION**

Courts "are 'not required to exhibit a naiveté from which ordinary citizens are free.'" *Department of Commerce v. New York*, 588 U.S. 752, 785 (2019). And ordinary citizens understand that it is *gambling* to wager money on which team will win a baseball game or which candidate will win an election.[1] Until very recently, no one would have ventured otherwise.

Prediction markets, predictably, take a different view. They offer "event contracts" that allow Illinois residents to wager money on questions like "Will Spain win the 2026 World Cup?" or "Will Russell Fry win the 2026 South Carolina Republican Senate special primary?" They insist that these sports and election event contracts are not gambling, however, but rather are sophisticated financial instruments used for hedging risk. It may be difficult to say this with a straight face, but the prediction markets have no choice: "the regulation of gambling has been largely left to the state legislatures," *United States v. King*, 834 F.2d 109, 111 (6th Cir. 1987), and the prediction markets' business model relies on *evading* state regulation.[2]

Prediction markets could lawfully accept sports wagers if they would simply obtain a license from the Illinois Gaming Board and submit to regulation under state law. They refuse to do so. Instead, with an assist from their allies in the federal government, the prediction markets contend that Illinois gaming laws are preempted by the Commodity Exchange Act. The plain text of federal law shows otherwise. Sports and election event contracts are not "swaps" under the Commodity Exchange Act. Regardless, Congress did not intend to preempt state gaming laws.

---

[1] Jonathan D. Cohen, "Most Americans see prediction markets as more like gambling than investing, new AIBM/Ipsos poll finds," *American Institute for Boys and Men* (Mar. 17, 2026), aibm.org/research/most-americans-see-prediction-markets-as-more-like-gambling-than-investing-new-aibm-ipsos-poll-finds/.

[2] The Court is already very familiar with these issues. Defendants therefore refrain from repeating the entire background and instead incorporate their brief in opposition to the preliminary injunction motion in *Coinbase Financial Markets, Inc. v. Raoul*, No. 25 C 15406 (N.D. Ill. Jan. 23, 2026), ECF 37.

What's more, the equities overwhelmingly favor state regulation. The truth about prediction markets is starting to emerge: Most trading concerns the outcomes of athletic competitions—the sort of wagering that many fear is "particularly addictive and especially attractive to young people." *Murphy v. NCAA*, 584 U.S. 453, 460 (2018). "And the evidence suggests that ordinary users seem to do even worse in prediction markets than in traditional gambling contexts." Indeed, "ordinary users of" "the largest prediction market in the United States" "have lost more than half a billion dollars" since it was launched.[3]

The public plainly suffers when unregulated gambling occurs on the prediction markets' platforms. But the Illinois Gaming Board has the experience and expertise necessary to ensure that sports wagering is done safely and responsibly. The law and the equities are therefore aligned: the pending preliminary injunction motions should all be denied.[4]

## LEGAL STANDARD

"A preliminary injunction is an 'extraordinary' equitable remedy that is 'never awarded as of right.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024). "A plaintiff seeking a preliminary injunction must establish a likelihood of success on the merits, a likelihood of suffering irreparable harm in the absence of preliminary relief, that the balance of equities tips in the plaintiff's favor, and that an injunction is in the public interest." *Minocqua Brewing Company LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). "[A] 'strong' showing of likelihood of success" is required. *Protect Our Parks, Inc. v. Buttigieg*, 39 F.4th 389, 397 (7th Cir. 2022).

---

[3] Brad Lipton & Toyosi Odusola, "Since Kalshi's Launch, Ordinary Users Have Lost Half a Billion Dollars," *Roosevelt Institute* (July 7, 2026), rooseveltinstitute.org/blog/since-kalshis-launch-ordinary-users-have-lost-half-a-billion-dollars/ ("Lipton & Odusola").

[4] This brief responds to the preliminary injunction motions filed by the United States and Commodity Futures Trading Commission (collectively "CFTC"), *CFTC* ECF 31; KalshiEX LLC ("Kalshi"), *Kalshi* ECF 19; and the Coalition for Fair Markets ("Coalition"), *CFTC* ECF 60. The Coalition has withdrawn (without prejudice) the portion of its motion based on its dormant commerce clause claim. *CFTC* ECF 66.

**ARGUMENT**

**I.    Plaintiffs are unlikely to succeed on the merits of their preemption claims.**

Sports and election event contracts are not "swaps" under the Commodity Exchange Act[5] and, even if they were, Congress did not thereby intend to preempt Illinois gaming laws.[6]

**A.    Sports and election event contracts are not "swaps."**

Start with the definition of a "swap." Plaintiffs' preemption arguments rely on language in the Commodity Exchange Act that gives the CFTC "exclusive jurisdiction" over "transactions involving swaps" that are "traded or executed on" designated contract markets. 7 U.S.C. § 2(a)(1)(A). If sports and election event contracts are not swaps, then these arguments must fail.

A swap is a type of derivative—a financial instrument where the value derives from an underlying asset. *E.g.*, *United States v. Phillips*, 155 F.4th 102, 112-13 (2d Cir. 2025). The ordinary meaning of a swap is a contract in which two parties agree to exchange future cash flows based on an external reference. *E.g.*, *Investment Company Institute v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013).[7] The present value of one of these assets is often uncertain—say because

---

[5] Plaintiffs have shown only that there is a dispute between them and Illinois officials concerning *sports and election* event contracts. *E.g.*, *Coinbase* ECFs 27-2 to 27-4 (cease-and-desist letters from the Illinois Gaming Board to prediction markets including Kalshi asserting that the board "has reason to believe that Kalshi is engaging in unlicensed *sports* wagering") (emphasis added); *see Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158-59 (2014) (Supreme Court "ha[s] permitted pre-enforcement review" only "under circumstances that render the threatened enforcement sufficiently imminent").

[6] Because the claims are likely to fail on the merits, the Court need not decide whether the CFTC or Coalition has standing. *Mullin v. Doe*, No. 25-1083, 2026 WL 1825840, at *11 (U.S. June 25, 2026).

[7] "The 'plain-vanilla' interest rate swap, the simplest and most common type of swap contract, obligates one counterparty to make payments equal to the interest which would accrue on an agreed hypothetical principal amount ('notional amount'), during a given period, at a specified fixed interest rate. The other counterparty must pay an amount equal to the interest which would accrue on the same notional amount, during the same period, but at a floating interest rate. If the fixed rate paid by the first counterparty exceeds the floating rate paid by the second counterparty, then the first counterparty must pay an amount equal to the difference between the two rates multiplied by the notional amount, for the specified interval. Conversely, if the floating rate paid by the second counterparty exceeds the fixed rate paid by the first counterparty, the fixed-rate payor receives payment." *Thrifty Oil Co. v. Bank of America National Trust & Saving Association*, 322 F.3d 1039, 1042-43 (9th Cir. 2003).

of fluctuating interest or currency rates. The contract allows a party to swap this uncertainty for a fixed rate of return. There is a clear commercial benefit to this sort of agreement. A business that is exposed to fluctuating interest rates (say on its debt) can lock in a fixed rate and thus protect itself against the risk that rates will have skyrocketed by the time the debt comes due.

Right off the bat, the ordinary meaning of a swap seems highly unlikely to encompass event contracts asking: "Will the Chicago White Sox win the 2026 World Series?" or "Will Ken Paxton win the 2026 Texas Senate election?" To be sure, the ultimate question is whether those contracts satisfy the statutory definition of "swap" that Congress enacted in the Commodity Exchange Act. *E.g.*, *Stenberg v. Carhart*, 530 U.S. 914, 942 (2000). But the ordinary meaning of a swap still matters: "When choosing among interpretations of a statutory definition, the 'ordinary meaning' of the 'defined term' is an important contextual clue." *Delligatti v. United States*, 604 U.S. 423, 435 (2025). Plus, as explained below, Congress was concerned about financial instruments satisfying the ordinary meaning of a swap when it enacted the definition and gave the CFTC authority to regulate "swaps." This matters too: courts must not "ignore[ ] the situation that Congress faced when it enacted" a statute because that can "lead[ ] to results that Congress is most unlikely to have wanted." *Murphy*, 584 U.S. at 469.

With this context in mind, turn now to Congress's definition. It is lengthy and written in the disjunctive, but plaintiffs rely on only one subsection. Sports and election event contracts are "swaps" within the meaning of the Commodity Exchange Act, they say, because those contracts provide for a "purchase, sale, payment, or delivery . . . that is dependent on [1] the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency [2] associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

The argument fails for two independent reasons. *First*, sports and election event contracts

4

provide payments that are dependent on the *outcome* of an athletic competition (the World Series) or election (the Texas Senate race)—rather than whether the event *occurs*. *Second*, athletic competitions and elections are not *inherently* financial, economic, or commercial.[8]

### 1. These contracts do not depend on the occurrence of an "event."

As relevant here, a financial instrument is a "swap" under the Commodity Exchange Act only if it provides a payment "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." 7 U.S.C. § 1a(47)(A)(ii). Congress did not define the words "occurrence," "event," or "contingency" in this subsection. So the first task is to consult dictionaries to determine the ordinary public meaning of the words at the time the provision was enacted in 2010. *E.g.*, *Bostock v. Clayton County*, 590 U.S. 644, 654-55, 657-58 (2020).

The dictionaries reveal that "[t]he ordinary meaning of the word occurrence is something happened." *North American Derivatives Exchange, Inc. v. Nevada*, 815 F. Supp. 3d 1169, 1183 (D. Nev. 2025); *see id.* at 1181 & n.4 (quoting definitions). This understanding "is consistent with the surrounding words of nonoccurrence and extent of the occurrence. Those words mean something happened, did not happen, or happened to an extent." *Id.* at 1183. A baseball game, for example, might be played for nine innings as scheduled. It might be rained out altogether. Or it might get called in the fifth inning or stretch into fifteen innings.

As for "event," its "ordinary meaning" "is a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event." *North American*, 815 F. Supp. 3d at 1183; *see id.* at 1182 & nn.5-7 (definitions). True, some dictionaries define "event" as the "outcome of an action or occurrence; a result, a consequence." *E.g.*, OXFORD ENGLISH DICTIONARY (rev. ed. 2018); *see id.* (giving as

---

[8] Tellingly, plaintiffs devote little (if any) attention to briefing this threshold question.

an example a newspaper's 1711 report that "[a] beautiful creature in a widow's habit sat in court to hear the event of a cause concerning her dower"). But these dictionaries stress that this definition is "[n]ow rare," *id.*, or even "archaic," *North American*, 815 F. Supp. 3d at 1182. And an archaic meaning of a word is not its ordinary meaning. *E.g.*, *United States v. Smith*, 997 F.3d 215, 223 (5th Cir. 2021); *see Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 569 (2012).

It's also true that some dictionaries "identify 'event' as a synonym for 'occurrence.'" *North American*, 815 F. Supp. 3d at 1182. Even so, these dictionaries "make distinctions between the two" words: "'occurrence is the general word for anything that happens or takes place,' while 'an event is an occurrence of relative significance, especially one growing out of earlier happenings or conditions.'" *Id.* Because "Congress chose different words for occurrence and event in the definition of a swap," courts "must ascribe some significance to that decision." *Id.*; *see, e.g.*, *Moskal v. United States*, 498 U.S. 103, 109 (1990) (same).

So "occurrence" means "something happened," and "event" means "a happening of some significance" like "a particular sporting event." *North American*, 815 F. Supp. 3d at 1183. What about "contingency"? "[M]any dictionaries define contingency to include a contingent event": an event that might (or might not) occur. *Id.* at 1183 n.9; *see QCX LLC v. Nessel*, No. 1:26-cv-710, 2026 WL 1895958, at *2 (W.D. Mich. June 17, 2026) (defining "contingency" as "a possible future event"). A contingency is therefore an event that *may* but is not *set* to occur.

Bringing this all together, "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" refers to *whether* an athletic competition or election will happen. 7 U.S.C. § 1a(47)(A)(ii). It does not refer to which team or candidate will *win* the contest. "An ordinary American interpreting the word 'event' would conclude that the Kentucky Derby is an event. But [which horse] wins the Kentucky Derby is an *outcome* of that event, not a separate

6

event in and of itself." *North American*, 815 F. Supp. 3d at 1183 (emphasis added).

Because the ordinary public meaning of a statutory term turns on how "the word is actually used," *United States v. Costello*, 666 F.3d 1040, 1044 (7th Cir. 2012), consider some recent examples. After the New York Knicks won Game 4 of the NBA Finals last month to earn their third victory in the "best of four" series, San Antonio Spurs superstar Victor Wembanyama told reporters that "there are two possible *outcomes* for Game 5": either the "Spurs win and extend the series" or the "Knicks win and become NBA champions."[9] And when New York congressman Dan Goldman lost his election last month, he told supporters that "'this is not the *outcome* I worked so hard for.'"[10] These statements illustrate that, in ordinary public usage, winning or losing are two possible *outcomes* of an underlying *event* (an athletic competition or an election). Now, try replacing the word "outcome" with "event." The experiment transforms these otherwise intelligible statements into something resembling gibberish.

Even plaintiffs are compelled to follow this ordinary public usage distinguishing between an event and its outcome. The CFTC tells the Court, for example, that "the *outcome* of a sporting *event* has 'potential' to affect" various "'stakeholders.'" *CFTC* ECF 31 at 173 (emphasis added); *see KalshiEX LLC v. Flaherty*, 172 F.4th 220, 227 (3d Cir. 2026) (same).[11] And Kalshi told the CFTC that its event contracts asking "'Will <team> win <title>?'" offer a payout "based on the *outcome* of a recurrent *event*." *Coinbase* ECF 27-1 at 244, 249 (emphasis added). Tellingly,

---

[9] Tim Reynolds, "The Spurs are still believers, but it's the Knicks who are 1 game from winning the NBA title," *Associated Press* (June 11, 2026), apnews.com/article/nba-finals-spurs-knicks-5f5cd598f458de6f8492d802539eb7ee (emphasis added).

[10] Mark Prussin & Ali Bauman, "Brad Lander defeats Rep. Dan Goldman in NY-10 Democratic primary," *CBS News* (June 24, 2026), cbsnews.com/newyork/news/dan-goldman-brad-lander-nyc-democratic-primary-results/ (emphasis added).

[11] The Third Circuit held that sports event contracts are swaps but did not consider the argument that those contracts depend on the outcome (rather than the occurrence) of events. *Flaherty*, 172 F.4th at 227-28.

plaintiffs *must* recognize this distinction when they are using language to communicate meaning.

Despite all this, the prediction markets insist that there is no meaningful distinction between an event and its outcome. But these arguments are unpersuasive. In each of the situations they point to where "event" and "outcome" supposedly refer to the same thing, either (1) the words in fact refer to different things, (2) the word "event" is being used incorrectly, or (3) those situations are not applicable to most sports and election event contracts.

Start with the argument that, in some circumstances, the *occurrence* of a game is correlated with a team's *winning* a prior game. Take baseball's World Series: the first team to win four games wins the championship. So, if the Los Angeles Dodgers lose three of the first five games, they must *win* the sixth game for there to *be* a seventh game. But it is wrong to say that there are no "differences of substance" between asking "Will the Dodgers win Game 6?" versus "Will there be a Game 7?" The answer to the latter question must account not only for the odds of a Dodgers loss in Game 6 but also for the possibility that Game 7 will be called off for independent reasons—say because of an act of terrorism or a natural disaster. The additional risk may be small, but it is not zero: many sporting events were unexpectedly cancelled at the outset of the Covid-19 pandemic, for instance.

What's more, this correlation is uncommon. It does not exist for any of the Dodgers' 162 regular season games, which will be played (or not) regardless of the teams' prior records. So too for football's Super Bowl and college basketball's March Madness. Really, this correlation is found almost exclusively in the "best of four" playoff series used to determine the champion of some professional sports. Even there, it is present only in limited circumstances: whether Game 2 of the World Series will be played, for example, does not depend on which team wins Game 1.

Turn next to the argument that asking "Will the Dodgers win Game 6?" is identical to

8

asking "Will the Major League Baseball recordkeeper note that the Dodgers won Game 6?" The assumption is that recording a win is an "event." It's not. An event "is a happening of some significance that [takes place] in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity." *North American*, 815 F. Supp. 3d at 1183. A ministerial act like recording a win satisfies none of these conditions: it is not itself a significant happening or organized activity, and it does not take place at a specific location and time.

Besides, the "event" of recording a win is not synonymous with the "outcome" of the underlying game. People make mistakes, and every attempt at keeping records of real-world activity (dating at least as far back as the Domesday Book) is necessarily at the mercy of human error (whether intentional or negligent). Take Ty Cobb, one of the greatest baseball players of all time. He was wrongly awarded the American League batting title in 1910 because one of his games (a particularly good one) was jotted down twice in the record books and inflated his average; it went unnoticed for seventy years.[12] So, again, asking whether the Major League Baseball recordkeeper will note that the Dodgers won Game 6 must account for an additional risk above and beyond the Dodgers' chances of winning the game: the possibility of human error.

Finally, consider the argument that some athletic competitions and elections are "kind of a big deal." It's true that the Chicago Cubs' winning the 2016 World Series or President Biden's winning the 2020 election can be described as "happenings of some significance"—and that this mirrors a definition of "event." But it doesn't follow that these are therefore "events" within the meaning of 7 U.S.C. § 1a(47)(A)(ii). "Dictionary definitions are acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background

---

[12] Dave Smith, "A Number of Changes," *National Baseball Hall of Fame*, baseballhall.org/discover-more/stories/baseball-history/changing-nature-of-statistics ("'official' means 'from the office'": it "carries with it authority and credibility, but the records may or may not reflect what actually happened").

understandings." *Costello*, 666 F.3d at 1044. So it's a mistake to privilege a dictionary definition over the way people really speak: "That a definition is broad enough to encompass one sense of a word does not establish that the word is *ordinarily* understood in that sense." *Taniguchi*, 566 U.S. at 568. Suppose you turned to some friends after watching the Cubs win the 2016 World Series and said, "What an incredible event!" They might think you were talking about the watch party they were hosting at their house (or the festivities at your favorite local establishment). If you wanted to refer to the Cubs' winning Game 7, you'd choose a different word . . . maybe something like, "What an incredible outcome!" or "What an incredible result!"[13]

Regardless, most athletic competitions and elections do not remotely approach the historic significance of a team known as the "lovable losers" winning a World Series championship for the first time in a century. This is a fatal flaw for the prediction markets because their argument only works (if at all) in these rare circumstances. To say that sports and election event contracts are "swaps" when the underlying contest is historically significant is just another way of saying that vanishingly few of those event contracts are actually "swaps."

### 2. These contracts are not "associated with" economic consequences.

As relevant here, a financial instrument is not a "swap" under the Commodity Exchange Act simply because it provides a payment "that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of" *any* "event or contingency." 7 U.S.C. § 1a(47)(A)(ii). The definition is satisfied only if the event or contingency is "associated with a potential financial, economic, or commercial consequence." *Id.* Congress did not define "associated," which means "[t]o connect or put together mentally; to view as somehow related." BLACK'S LAW DICTIONARY

---

[13] It might "be a significant occurrence" if the Tennessee "Titans won a Super Bowl," *KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026), but so too if they *lost*. The game is always a significant occurrence because of the nature of the *event*, regardless of the *outcome*.

(12th ed. 2024); *see KalshiEX LLC v. Hendrick*, 817 F. Supp. 3d 1014, 1027 & n.1 (D. Nev. 2025) ("'associated with' means joined or connected to").

How closely must an event be related to an economic consequence to satisfy this standard? As the prediction markets see things, not very. They contend that athletic competitions and elections are "associated with" economic consequences because, for example, football games draw out-of-town fans who may spend money at local businesses while they're visiting— and businesses may choose to invest in a city if a favored candidate wins a municipal election.

But the Commodity Exchange Act's definition of a "swap" would scarcely have any limits if downstream economic impacts like these were sufficient. "*Anything* can potentially have economic ramifications given enough attenuation and happenstance." *QCX*, 2026 WL 1895958, at *3; *see United States v. Lopez*, 514 U.S. 549, 565 (1995) ("depending on the level of generality, any activity can be looked upon as commercial"). This is a problem for the prediction markets because Supreme Court precedent makes clear that statutory terms like "associated," "related," and "connected" should not be interpreted "to the furthest stretch of [their] indeterminacy." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 655 (1995). Courts must instead identify "a limiting principle consistent with the structure of the statute and its other provisions." *Maracich v. Spears*, 570 U.S. 48, 60 (2013). This requires courts to apply "a 'fundamental canon of statutory construction': that 'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *United States v. Miller*, 604 U.S. 518, 533 (2025); *see Dubin v. United States*, 599 U.S. 110, 119 (2023) (when a statutory phrase "refers to a relationship or nexus" "the kind of relationship required, its nature and strength, will be informed by context").

So turn to the text of the Commodity Exchange Act and employ the usual tools of

11

statutory interpretation. Congress's definition of "swap" requires a connection between an action (the occurrence of an event) and an outcome (an economic consequence). 7 U.S.C. § 1a(47)(A)(ii). To say that an action is "associated with" an outcome often describes a relationship like proximate cause. *E.g.*, *Greater New Orleans Broadcasting Association, Inc. v. United States*, 527 U.S. 173, 185 (1999) ("social costs associated with 'gambling'"); *QCX*, 2026 WL 1895958, at *6 ("phrase 'smoking is associated with lung cancer' is suggestive of a direct, causal association given the surrounding context of the evidence related to smoking").

The ordinary meaning of a swap requires an even closer connection: a swap typically provides a payout when something happens that is *itself* an economic consequence (like a change in interest rates or foreign exchange rates). *E.g.*, *Phillips*, 155 F.4th at 108, 112-13 ("swaps are pure financial instruments based on the difference between two fluctuating values") (cleaned up); *Investment Company Institute v. CFTC*, 891 F. Supp. 2d 162, 171 (D.D.C. 2012) (swaps are "'financial contracts in which two counterparties agree to exchange or "swap" payments with each other as a result of such things as changes in a stock price'"); *see Delligatti*, 604 U.S. at 438 ("'Since on this side of the looking-glass an entirely artificial definition is rare, the meaning of the [statutory] definition is almost always closely related to the ordinary meaning of the word being defined.'") (quoting SCALIA & GARNER, READING LAW 228 (2012)).[14]

Applying these interpretive tools to the statutory definition of a "swap," the best reading of the phrase "associated with" requires "that the event or contingency itself has some potential financial, economic, or commercial consequence without looking at externalities like potential downstream financial consequences." *Hendrick*, 817 F. Supp. 3d at 1027; *see QCX*, 2026 WL

---

[14] *See* 7 U.S.C. § 1a(47)(A)(iv) (defining "swap" by ordinary meaning); *Bond v. United States*, 572 U.S. 844, 862 (2014) ("We are reluctant to ignore the ordinary meaning of 'chemical weapon' when doing so would transform [the] statute . . . into one that [ ] makes it a federal offense to poison goldfish.").

12

1895958, at *6 ("the contextually appropriate limit on the chains of association is that the potential economic consequences be 'inherently joined or connected with' the events underlying the contract"); *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, at *5-6 (S.D. Ohio Mar. 9, 2026) ("*Schuler I*") (same). In other words, Congress defined a "swap" as an agreement that provides a payout based on an event that is *inherently* economic in nature.[15]

Sports and election event contracts are not "swaps" because neither the occurrence nor the outcome of an athletic competition or an election is *inherently* financial, economic, or commercial in the same sense as a change in interest rates or the relative value of two currencies. *Hendrick*, 817 F. Supp. 3d at 1027; *see QCX*, 2026 WL 1895958, at *4 ("term 'swap' would not have been understood by educated users of the language to include 'sporting event contracts' to the extent that that category could be separated from sports betting, and the CFTC did not use the term 'swap' that way before" very recently). To be sure, athletic competitions and elections have downstream financial, economic, and commercial consequences. But almost anything "might have some conceivable financial consequence if one is creative enough"; if this was sufficient, a swap would include any agreement that pays out based "on anything that happens or could happen," which "is not a reasonable interpretation of the statute." *Hendrick*, 817 F. Supp. 3d at 1027; *see California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) ("as many a curbstone philosopher has observed, everything is related to everything else"). Simply put, "allowing the chains of association to extend to infinity" (as the prediction markets would have it) "'effectively reads the

---

[15] Congress added "potential" to indicate that the "financial, economic, or commercial consequence" did not need to be *realized* for the instrument to qualify as a swap. An interest-rate swap, for example, is still a swap under section 1a(47)(A)(ii) even if interest rates have not changed (and thus there is no *actual* financial consequence) when the contract closes. *See* BLACK'S LAW DICTIONARY (12th ed. 2024) ("potential" means "[c]apable of coming into being; possible if the necessary conditions exist").

13

limiting language . . . out of the statute." *QCX*, 2026 WL 1895958, at *6.[16]

This result follows not only from the text of the Commodity Exchange Act but also from its structure.[17] Recall that Congress defined "swap" as an agreement that satisfies the requirements listed in one of six subparts. 7 U.S.C. § 1a(47)(A). The prediction markets rely on subpart (ii). The other subparts, however, "refer almost exclusively to financial measures, indices, or instruments." *Hendrick*, 817 F. Supp. 3d at 1027; *see, e.g.*, 7 U.S.C. § 1a(47)(A)(iii) (defining a "swap" as providing for an exchange of payments "based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind"). When "several items in a list share an attribute," this "counsels in favor of interpreting the other items as possessing that attribute as well." *Beecham v. United States*, 511 U.S. 368, 371 (1994). "Reading subpart (ii) in context of the surrounding subparts" thus lends further support for "the conclusion that 'associated with a potential financial, economic, or commercial consequence' means that the event or contingency must be inherently associated with a potential financial consequence, not just that the event or contingency may have some potential downstream financial consequence." *Hendrick*, 817 F. Supp. 3d at 1028; *see Snyder v. United States*, 603 U.S. 1, 19 (2024) ("Congress commonly writes federal statutes" in "a belt and suspenders manner").[18]

---

[16] Ignoring these rules, the Third Circuit said "[t]he outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence" and left it at that. *Flaherty*, 172 F.4th at 227-28. It did not "articulate any limit on the chains of association." *QCX*, 2026 WL 1895958, at *3 n.4.

[17] The "special rule" in 7 U.S.C. § 7a-2(c)(5)(C) is not evidence of congressional intent that some event contracts are swaps. The rule is "insufficient to transform the text of the swap definition" and is best read as "a failsafe against attempts to portray" those contracts as swaps. *QCX*, 2026 WL 1895958, at *7.

[18] The prediction markets argue that this interpretation of subpart (ii) is "underinclusive" because, for example, it wouldn't capture event contracts relating to the weather. *QCX*, 2026 WL 1895958, at *7. But "the other prongs of the definition make any underinclusivity irrelevant": "weather swaps are specifically enumerated" in subpart (iii)(XVII), for example. *Id.* "Reining in [subpart (ii)] from a boundless reach would not undermine the definition's ability to capture Congress's intended targets." *Id.*

14

Finally, on top of text and structure, consider history. After all, "ignor[ing] the situation that Congress faced when it enacted" a statute can "lead[ ] to results that Congress is most unlikely to have wanted." *Murphy*, 584 U.S. at 469; *see Edwards v. Aguillard*, 482 U.S. 578, 595 (1987) (courts may consider "historical context" and "events leading to [statute's] passage"). Courts have long understood that "'statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.'" *Costello*, 666 F.3d at 1043 (quoting *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Hand, J.)); *see Biden v. Nebraska*, 600 U.S. 477, 511-12 (2023) (Barrett, J., concurring) ("Context is not found exclusively within the four corners of a statute" and "includes common sense") (cleaned up).

Here, the definition of "swap" comes from the Dodd-Frank Wall Street Reform and Consumer Protection Act, Public Law 111-203, § 721. "Trading in swaps" based on inherently economic events "exploded in the early 2000s leading up to the 2008 financial crisis," and "many saw the previous lack of regulation in swaps as a contributing cause." *Phillips*, 155 F.4th at 113. Congress agreed that unregulated trading in swaps and other derivatives was "a major contributor to the financial crisis:" the lack of transparency in a market "dominated by the too-big-to-fail financial companies" caused concerns about counterparty risk that "played an important role in freezing up credit markets"; the absence of "regulatory requirements for margin or capital" allowed traders to "take large speculative positions on a relatively small capital base"; and the opaque interconnectedness of these markets "'amplified or transmitted shocks'" and other risks throughout the system. Senate Report 111-176 at 29-32; *see Digital Realty Trust, Inc. v. Somers*, 583 U.S. 149, 155 (2018) (relying on report as evidence of Congress's purpose in enacting Dodd-Frank). And Congress was particularly concerned about credit-default swaps, Senate Report 111-176 at 29-30, which pay out based on the occurrence of an inherently

15

economic event like "a reduction in [a company's] credit rating," *Hoosier Energy Rural Electric Cooperative, Inc. v. John Hancock Life Insurance Co.*, 582 F.3d 721, 724 (7th Cir. 2009).

History thus "make[s] clear that Congress intended the definition of swap to capture a set of products in the financial industry which caused the 2008 financial crisis and threatened to create other crises in the future." *QCX*, 2026 WL 1895958, at *8. And this history explains why Congress gave the CFTC "exclusive jurisdiction" over "transactions involving swaps": it wanted to address "systemic risks in the financial sector that undermined U.S. financial stability." *Hendrick*, 817 F. Supp. 3d at 1028-29. The definition of "swap" that Congress enacted to shape the CFTC's mandate "should be interpreted through that lens." *Id.* at 1029. In other words, it should reflect the financial instruments that Congress intended to regulate. And the Court can be confident that Congress was spurred to action back in 2010 by unregulated trading in financial instruments based on inherently economic events—the common meaning of a "swap"—rather than by people betting on which team will win the Super Bowl. *QCX*, 2026 WL 1895958, at *4 ("Congress had nothing like [sports event contracts] in mind when it defined 'swap.'"); *see Bond*, 572 U.S. at 861 (courts "particularly" should "consider the ordinary meaning of a defined term" if "there is dissonance between that ordinary meaning and the reach of the definition").[19]

**B.       Congress did not intend to displace state gaming laws.**

Even if sports and election event contracts satisfied the statutory definition of "swaps" (they do not), it would not follow that Congress intended to preempt the application of Illinois law. The prediction markets' arguments rely on the Commodity Exchange Act provision that says the CFTC "shall have exclusive jurisdiction" over "transactions involving swaps" that are traded

---

[19] Kalshi says that *anything* traded on designated contract markets is subject to the CFTC's exclusive jurisdiction. As relevant here, only *swaps* are so subject, and "swaps must be identifiable as swaps without regard to whether they were traded on a designated market." *QCX*, 2026 WL 1895958, at *8.

16

on markets it regulates. 7 U.S.C. § 2(a)(1)(A). But Seventh Circuit precedent forecloses the

contention that Congress intended only the CFTC to regulate these transactions.

### 1. Section 2(a)(1)(A) enacts ordinary conflict preemption principles.

Section 2(a)(1)(A) of the Commodity Exchange Act provides:

> The [CFTC] shall have exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions involving swaps . . . traded or executed on a contract market designated pursuant to section 7 of this title . . . . Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

At first blush, the "exclusive jurisdiction" language of the first sentence may seem to "coexist[ ]

somewhat uneasily" with the savings clauses that immediately follow. *American Agriculture*

*Movement, Inc. v. The Board of Trade of the City of Chicago*, 977 F.2d 1147, 1155 (7th Cir.

1992). But the Seventh Circuit has explained definitively how all this statutory language can be

given "full effect." *Id.*; *see Effex Capital, LLC v. National Futures Association*, 933 F.3d 882,

893 n.26 (7th Cir. 2019) (explaining that these portions of *American Agriculture* remain good

law). For starters, the Seventh Circuit rejected the argument that, in granting the CFTC

"exclusive jurisdiction" over certain financial instruments, Congress intended "to completely

preempt state law[s]" affecting those instruments. *American Agriculture*, 977 F.2d at 1155.

Rather, the court continued, "Congress intended to preempt some, but not all, state laws that bear

upon the various aspects of commodity futures trading" and other regulated products. *Id.*

To determine "how this line should be drawn," the Seventh Circuit examined "the goals

and policies underlying the statute." *American Agriculture*, 977 F.2d at 1155-56; *see Murphy v.*

*Smith*, 583 U.S. 220, 226 (2018) (endorsing courts' "stepping back to take in the larger statutory

scheme"). The court concluded that state laws are preempted under section 2(a)(1)(A) of the Commodity Exchange Act when they "stand 'as an *obstacle* to the accomplishment and execution of the full purposes and objectives of Congress.'" *American Agriculture*, 977 F.2d at 1156-57 (emphasis added) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). This is, of course, the familiar standard of "obstacle preemption": a subcategory of implied conflict preemption. *E.g.*, *United States v. Illinois*, 795 F. Supp. 3d 1057, 1069 (N.D. Ill. 2025).[20]

The claims found preempted in *American Agriculture* illuminate what the Seventh Circuit meant by "obstacle." In the summer of 1989, the Chicago Board of Trade (a designated contract market like Kalshi) issued an emergency resolution requiring participants to liquidate soybean futures contracts to prevent what the board feared was an attempt at market manipulation. 977 F.2d at 1151-52. Farmers harmed by the resulting price drop contended that the board "was motivated by something other than a desire to prevent distortions in the soybean futures market" and sued "for common law breach of fiduciary duty and negligence." *Id.* at 1151-52, 1153-54.

The Seventh Circuit held that the farmers' common law claims were preempted by the Commodity Exchange Act. The court explained that Congress enacted section 2(a)(1)(A) and its "exclusive jurisdiction" language because it worried about state laws that "might have subjected the national futures trading apparatus to *conflicting* regulatory demands." *American Agriculture*, 977 F.2d at 1156 (emphasis added). And, the court continued, Congress's concern would be realized if the farmers were allowed to press their claims against the Board of Trade for its emergency resolution to liquidate soybean futures contracts: the board was "required" by federal law "to monitor 'market activity for indications of . . . possible price distortion,'" *id.* at 1151, and

---

[20] The other subcategory of implied conflict preemption is impossibility preemption, which seems to be a specific application of obstacle preemption. If it is impossible to comply with both state and federal law, then of course the state law is going to stand as an obstacle to Congress's purposes and objectives.

18

any dispute about whether the resolution was truly necessary to thwart market manipulation would be "intimately tied to the *operation* of a contract market," *id.* at 1157 (emphasis added). In other words, layering conflicting state requirements on top of the Board of Trade's federal mandate to prevent market manipulation would pose an obstacle to Congress's purposes. *Id.*

*American Agriculture* is therefore best read as applying ordinary conflict preemption principles to a particular set of facts. *See Effex Capital*, 933 F.3d at 895 (holding that common law claims challenging the validity of disciplinary proceedings under the Commodity Exchange Act were preempted because those claims posed an "obstacle to Congress's purposes"). To be sure, the Seventh Circuit said in summary that state laws are preempted under the Commodity Exchange Act if they "directly affect trading on or the operation of a futures market." *American Agriculture*, 977 F.2d at 1156. But one sentence in a long opinion should not be treated like an express preemption provision. For one thing, "[j]udicial opinions must not be confused with statutes, and general expressions must be read in light of the subject under consideration." *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010). For another, "'[i]t is Congress rather than the courts that pre-empts state law.'" *Chamber of Commerce v. Whiting*, 563 U.S. 582, 607 (2011).

Illinois gaming laws are therefore preempted under section 2(a)(1)(A) of the Commodity Exchange Act only if the prediction markets can establish that state law "stand[s] 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *American Agriculture*, 977 F.2d at 1156-57. Before turning to that question, take a brief detour to see why this precedent forecloses the alternative theories of express and field preemption.

### 2.     *American Agriculture* necessarily rejects express preemption.

The Seventh Circuit was correct to hold in *American Agriculture* that section 2(a)(1)(A)'s "exclusive jurisdiction" language must be read with its savings clauses to preserve all state laws

19

except those that conflict with Congress's purpose in enacting the Commodity Exchange Act. *E.g.*, *Pulsifer v. United States*, 601 U.S. 124, 133 (2024) (statutes are interpreted "by reviewing text in context"). In so holding, the court necessarily rejected the prediction markets' arguments that this language functions as an express preemption provision that displaces *all* state law. To see why, begin by recognizing that section 2(a)(1)(A)'s assertion about the CFTC's "exclusive jurisdiction" would be an unusually oblique way for Congress to communicate its preemptive intent. *See Kerr v. First Commodity Corp. of Boston*, 735 F.2d 281, 288 (8th Cir. 1984) (Commodity Exchange Act has no express preemption provision); *KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 1295806, at *4 (6th Cir. Apr. 24, 2026) ("*Schuler II*") ("typical [express preemption] provision contains language that uses words like 'preempt' or 'supersede'").

Compare, for example, the two provisions of the Commodity Exchange Act that everyone agrees expressly preempt state law: *First*, Congress said that federal law "shall supersede and preempt the application of any State or local law that prohibits or regulates gaming" under certain circumstances that do not include swaps and that everyone agrees are not applicable here. 7 U.S.C. § 16(e)(2). *Second*, Congress said that a swap "may not be regulated as an insurance contract under the law of any State" (omitting any reference to gaming regulations). *Id.* § 16(h)(2). In contrast to section 2(a)(1)(A), the language of these separate sections of the statute plainly "expresses" the "clear and manifest purpose" required to conclude that Congress "intend[ed] to supersede" the states' "historic police powers." *Patriotic Veterans, Inc. v. Indiana*, 736 F.3d 1041, 1046 (7th Cir. 2013). And the existence of these express preemption provisions "implies that matters beyond [their] reach"—like the application of state gaming law to swaps— "are not pre-empted." *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 517 (1992); *see Schuler I*, 2026 WL 657004, at *8 (lack of express preemption provision "is 'strong evidence' that

20

Congress did not intend the [Commodity Exchange Act] to preempt state sports gambling laws").

What's more, "exclusive jurisdiction" is most naturally read to delineate which court or agency has power to *act* (as opposed to which *law* applies). *E.g.*, *Haaland v. Brackeen*, 599 U.S. 255, 265-66 (2023) (distinguishing between separate statutory provisions that displace state law and grant "exclusive jurisdiction" to tribal courts); *Transcontinental Gas Pipe Line Co., LLC v. Pennsylvania Environmental Hearing Board*, 108 F.4th 144, 151-52 (3d Cir. 2024) (giving "exclusive jurisdiction" to federal courts withdraws state courts' concurrent jurisdiction).[21]

As it turns out, this is the very reason why Congress used the phrase "exclusive jurisdiction" in section 2(a)(1)(A): "to make clear that as among *federal agencies*, the CFTC would have exclusive authority" to regulate "rather than the [Securities and Exchange Commission]." *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 678 (D. Md. 2025); *see R.J. Hereley & Son Co. v. Stotler & Co.*, 466 F. Supp. 345, 347 (N.D. Ill. 1979) ("reference to [CFTC]'s exclusive jurisdiction was merely intended to remedy the confusion about whether certain types of commodities transactions [were] subject to regulation under the securities laws"). The language was added to the Commodity Exchange Act during "an extensive overhaul" in 1974; Congress "expanded the statute's coverage" and also "altered its enforcement scheme" by creating the CFTC. *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). The point of spelling out the CFTC's "exclusive jurisdiction" was to allocate turf between the federal commodities and securities regulators. *Id.*[22]

---

[21] Perhaps this is why *Slaney v. The International Amateur Athletic Federation*, 244 F.3d 580, 596 (7th Cir. 2001), affirmed a dismissal for lack of jurisdiction when confronted with similar language. *See Turek v. General Mills, Inc.*, 662 F.3d 423, 425 (7th Cir. 2011) (preempted claims are dismissed on the merits).

[22] Section 2(a)(1)(A)'s reference to "other regulatory authorities under the laws of . . . any State" is therefore best read to mean state *securities* regulators. *See, e.g.*, *Fischer v. United States*, 603 U.S. 480, 488 (2024) ("a general phrase can be given a more focused meaning by the terms linked to it").

21

Congress "must do much more to" displace state law than enact "a statute granting regulatory authority over that subject matter to a federal agency." *Kurns v. Railroad Friction Products Corp.*, 565 U.S. 625, 638 (2012) (Kagan, J., concurring). But that's all that Congress did in section 2(a)(1)(A) of the Commodity Exchange Act. *Schuler II*, 2026 WL 1295806, at *4; *QCX*, 2026 WL 1895958, at *10. So the Seventh Circuit was correct to hold that the statute merely requires courts to apply the same conflict preemption principles that the supremacy clause implies in every federal statute. *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 324 (2015) (courts "must not give effect to state laws that conflict with federal laws").[23]

### 3. *American Agriculture* also forecloses field preemption.

The same Seventh Circuit precedent allows the Court to make quick work of the prediction markets' argument that Congress intended to occupy the entire field of trading on CFTC-regulated markets. This theory too relies on section 2(a)(1)(A)'s grant of "exclusive jurisdiction" to the CFTC. But *American Agriculture* holds unambiguously that this language does *not* reflect congressional intent "to preempt the field" because it is accompanied by two savings clauses "designed to preserve in the futures trading context at least some state law causes of action[ ]." 977 F.2d at 1155; *see Effex Capital*, 933 F.3d at 894 (reaffirming that "the Commodity Exchange Act [does] not manifest an intent to occupy completely the entire field").

This is plainly the right result. Field preemption is "rare," *Kansas v. Garcia*, 589 U.S. 191, 208 (2020), and "confined to only a few areas," *Nelson v. Great Lakes Educational Loan*

---

[23] Without mentioning it by name, the Coalition's express preemption argument concludes by citing cases applying the intergovernmental tax immunity doctrine. *E.g.*, *Dawson v. Steager*, 586 U.S. 171, 173-74 (2019). The doctrine has no application here. It "bar[s] taxes that operate so as to discriminate against the Government or those with whom it deals." *Davis v. Michigan Department of Treasury*, 489 U.S. 803, 812 (1989) (cleaned up); *see* 4 U.S.C. § 111 (codifying doctrine as to state taxation of federal employees). The Coalition cites no case applying the intergovernmental tax immunity doctrine to entities that are merely *regulated* by the federal government. *See United States v. Cook County*, 167 F.3d 381, 384 (7th Cir. 1999) (doctrine applies to "taxes whose economic incidence is borne by a governmental body").

22

*Services, Inc.*, 928 F.3d 639, 652 (7th Cir. 2019). It is especially unlikely here: "regulating gambling is at the core of the state's residual powers as a sovereign in our constitutional scheme," *WV Association of Club Owners & Fraternal Services, Inc. v. Musgrave*, 553 F.3d 292, 302 (4th Cir. 2009); *see Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905), and Congress incorporated state law in the Commodity Exchange Act, 7 U.S.C. § 7a-2(c)(5)(C)(i)(I) & (ii); *see Schuler II*, 2026 WL 1295806, at *5 ("A perusal of the Commodities Exchange Act shows that it often permits state regulation."); *QCX*, 2026 WL 1895958, at *11 (Commodity Exchange Act "relies on the existence of state law and leaves room for states to enforce both the statute itself and state laws in the same field"). The prediction markets therefore cannot establish "a framework of regulation" for CFTC-regulated markets that is "so pervasive that Congress left no room for the States to supplement it"—or "a federal interest" in CFTC-regulated markets that is "so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up).[24]

### 4. Illinois gaming laws are not an obstacle to Congress's objectives.

Return now to the question whether the prediction markets have shown that Illinois gaming laws are preempted under section 2(a)(1)(A) of the Commodity Exchange Act because they are "'an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *American Agriculture*, 977 F.2d at 1156-57. Again, this is the obstacle preemption standard. And obstacle preemption is a subcategory of conflict preemption, which applies to state laws that "'would do "major damage" to clear and substantial federal interests.'" *McHenry County v. Raoul*, 44 F.4th 581, 591 (7th Cir 2022). So, to prevail, the prediction markets must

---

[24] Field preemption cannot 'be inferred merely from the comprehensive character of" federal law because "subjects of modern social and regulatory legislation often by their very nature require intricate and complex responses." *New York State Department of Social Services v. Dublino*, 413 U.S. 405, 415 (1973).

establish two propositions: *First*, that there is a clear and substantial federal interest in allowing sports and election event contracts to be traded on prediction markets. *Second*, that parallel state regulation of these event contracts would do major damage to this federal interest.

There is *no* federal interest (much less a clear and substantial one) in allowing people to speculate on which team will win this weekend's games between the Chicago White Sox and the Toronto Blue Jays—or next month's election between Haley Stevens and Abdul El-Sayed. When Congress gave the CFTC "exclusive jurisdiction" over swaps, it also authorized the commission to prohibit "trading" in event contracts that it "determine[s]" "are contrary to the public interest" because they "involve": "(I) activity that is *unlawful* under any Federal or *State* law; (II) terrorism; (III) assassination; (IV) war; (V) *gaming*; or (VI) other similar activity." 7 U.S.C. § 7a-2(c)(5)(C)(i) & (ii) (emphasis added); *see* 720 ILCS 5/28-1(a)(2) (forbidding wagers on election results). It would be astonishing to suggest that this provision evidences Congress's desire to promote trading in *most* event contracts involving terrorism, assassination, and war— and to exclude only those few that the CFTC finds are contrary to the public interest. The better reading of the statute is that *any* event contract involving these subjects is, *by definition*, contrary to the public interest. And there is no textual basis to treat event contracts involving gaming or unlawful activity (like election wagering) any differently than those involving terrorism, assassination, and war. *Accord* 17 C.F.R. § 40.11(a)(1) (forbidding all such event contracts).

Legislative history confirms what the text of the Commodity Exchange Act establishes: Congress did not want sports and election wagering on CFTC-regulated markets. *See, e.g.*, *Sturgeon v. Frost*, 587 U.S. 28, 54 (2019) (consulting legislative history to confirm statute's plain language). The sponsor of section 7a-2(c)(5)(C) explained that its purpose was to "prevent gambling through futures markets." 156 Cong. Rec. S5906 (daily ed. July 15, 2010). What's

24

more, until very recently, the CFTC itself acknowledged that Congress did not intend for gambling to occur on designated contract markets. *See Schuler I*, 2026 WL 657004, at *9.

Even if there *is* a federal interest in promoting sports and election event contracts (there is not), the prediction markets cannot show that Illinois law wreaks "major damage." *McHenry County*, 44 F.4th at 591. The gist of the argument is that prediction markets should not be forced to comply with a patchwork of state laws. But this argument "sound[s] in field preemption," not conflict preemption. *Conti v. Citizens Bank, N.A.*, 157 F.4th 10, 27 (1st Cir. 2025). Overlap between federal and state law does not, on its own, suffice for conflict preemption: "To preserve the federal system, we do not prevent the States from regulating everything federal law touches." *Zyla Life Sciences, L.L.C. v. Wells Pharma of Houston, L.L.C.*, 134 F.4th 326, 335 (5th Cir. 2025); *see MITE Corp. v. Dixon*, 633 F.2d 486, 493 (7th Cir. 1980) ("mere differences between state and federal regulation of the same subject are not conclusive of preemption").[25]

Regardless, as applied to sports event contracts, state gaming laws "complement rather than conflict with federal law." *KalshiEX LLC v. Williams*, No. 25 Civ. 8846 (AT), 2026 WL 2017466, at *9 (S.D.N.Y. July 13, 2026). Illinois law requires prediction markets to obtain licenses from the Illinois Gaming Board and follow state regulations. 230 ILCS 45/25-20(a); *see, e.g.*, *Martin*, 793 F. Supp. 3d at 686 ("Maryland sports gambling laws" do "not pose an obstacle to Kalshi making" its contracts "available to users").[26] The prediction markets can muster up

---

[25] Kalshi cites the CFTC's assertion that it would be annoying to have to get up to speed on how different state laws might apply to swaps. "This argument fundamentally misunderstands the governmental structure established by our Constitution." *Gamble v. United States*, 587 U.S. 678, 689-90 (2019).

[26] The Coalition complains that the Illinois Gaming Board could interpret a brand-new law to impose a 10,000 percent tax on sports event contracts traded on prediction markets. 230 ILCS 45/25-90(d-20). Supreme Court precedent "counsel[s] caution" under these circumstances. *Arizona*, 567 U.S. at 415. When "[t]here is a basic uncertainty about what [a state] law means and how it will be enforced," and "without the benefit of a definitive interpretation from the state courts, it would be inappropriate to assume [the state law] will be construed in a way that creates a conflict with federal law." *Id.*

only one concrete concern. *See English v. General Electric Co.*, 496 U.S. 72, 90 (1990) (anything less would be "too speculative a basis on which to rest a finding of pre-emption").[27] They worry that a license would allow them to accept wagers only from people in Illinois. 230 ILCS 45/25-25(e). But there is no inconsistency with federal law: although a designated contract market must provide "impartial access to its markets" under 17 C.F.R. § 38.151(b), this is best understood "as an anti-discrimination command, not as a limit on a facially neutral requirement" like being physically present in Illinois, *Schuler II*, 2026 WL 1295806, at *6.[28] An Illinois license would not *prevent* prediction markets from accepting wagers from people located in other states, so long as they comply with those other states' laws. Regardless, there are more than enough people in Illinois to allow a state-specific market in sports event contracts to be sufficiently liquid for price discovery (and arbitrage should eventually cause prices to converge across all state-specific markets). Plus, states can find ways to allow their residents to sell each other *legal* sports event contracts on CFTC-regulated markets. *E.g.*, Multi-State Internet Gaming Agreement (allowing online poker players from different states to play each other).[29]

Alone among plaintiffs, the Coalition charges that 17 C.F.R. § 38.151(b) conflicts with Illinois law forbidding certain sports wagering. The Coalition understandably declines to specify precisely *what* Illinois law forbids: "wagers on a kindergarten through 12th grade sports event," 230 ILCS 45/25-25(h), for example, and wagers on National Football League player injuries and

---

[27] Kalshi's "careful balance" argument based on *Arizona*, 567 U.S. at 406, is inconsistent with more recent Supreme Court precedent that "question[s] the wisdom and legitimacy of grounding preemption upon judicial '[e]fforts to ascribe unenacted purposes and objectives to a federal statute.'" *Maine Forest Products Council v. Cormier*, 51 F.4th 1, 8 (1st Cir. 2022).

[28] Even further afield is the Coalition's argument that 17 C.F.R. § 38.151(b) forbids it to pass along state taxes. Subsection (b)(2) simply requires prediction markets to provide "[c]omparable fee structures for members, persons with trading privileges and independent software vendors." And "comparable" means "like in quality and quantity, though not identical." BLACK'S LAW DICTIONARY (12th ed. 2024).

[29] Available at compacts.csg.org/wp-content/uploads/2024/03/Multistate-Internet-Gaming-Agreement.pdf.

off-field misconduct, Illinois Gaming Board, Final Order (February 6, 2025).[30] Of course, there is no federal interest in wagering money on the outcomes of middle-school basketball games or whether recently signed Atlanta Falcons quarterback Tua Tagovailoa will suffer another concussion this year now that's he's playing behind a significantly better offensive line.[31]

"'The scope of laws regulating gambling and lotteries is clearly a matter of predominantly state concern.'" *Williams*, 2026 WL 2017466, at *5. The prediction markets have not identified a true conflict between Illinois gaming law and their (allegedly) federally regulated activity. So continuing to apply state requirements to sports and election wagers will not cause "major damage" to clear and substantial federal interests.'" *McHenry County*, 44 F.4th at 591.[32]

### C. Congress does not "hide elephants in mouseholes."

For all these reasons, the usual interpretive methods establish that the prediction markets' claims must fail: sports wagers aren't swaps, and state law isn't displaced even assuming they are. If more is needed, the prediction markets' arguments also run afoul of two "clear statement" rules that guide courts' understanding of congressional purpose: the federalism canon and the "major questions" doctrine. Both reflect the proposition that Congress does not "hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001).

*First*, "it is incumbent upon the federal courts to be certain of Congress' intent before

---

[30] Available at igb.illinois.gov/content/dam/soi/en/web/igb/documents/sports/1130-requests-orders/igb-sw-1130-order-nfl.pdf.

[31] *Churchill Downs Technology Initiatives Co. v. Michigan Gaming Control Board*, 162 F.4th 631 (6th Cir. 2025), is inapposite. Federal law authorizes interstate wagering on horse races if *two* states approve (the one where the race happens and the one where the wager is accepted). *Id.* at 635-36. The challenged state law purported to require a *third* state's approval (the one where the wager is placed). *Id.* at 636-37. The Sixth Circuit concluded that the state law posed a conflict because "Congress intended to loop two states into the process"—not three. *Id.* at 638. In other words, federal law imposed a specific requirement, and state law unambiguously interfered. The prediction markets have not shown anything comparable here.

[32] The CFTC did not plead an intergovernmental immunity claim and cannot smuggle one in through a footnote in its motion. *Texas v. Department of Homeland Security*, 123 F.4th 186, 208-09 (5th Cir. 2024).

finding that federal law overrides the usual constitutional balance of federal and state powers." *Bond*, 572 U.S. at 858 (cleaned up). Thus, courts "typically presume that a federal statute does not preempt or disrupt a state's legal or regulatory regime in areas traditionally associated with state police power without stating so *clearly*." *South Branch LLC v. Commonwealth Edison Co.*, 46 F.4th 646, 651-52 (7th Cir. 2022) (emphasis added). This "clear statement" requirement ensures that Congress "'has in fact faced, and intended to bring into issue, the critical matters involved.'" *Bond*, 572 U.S. at 858. There is no serious question that the gambling regulations the prediction markets seek to displace are exercises of the states' traditional police powers. *E.g.*, *Rosemont v. Jaffe*, 482 F.3d 926, 936-37 (7th Cir. 2007); *King*, 834 F.2d at 111.

*Second*, courts likewise require "Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama Association of Realtors v. Department of Health & Human Services*, 594 U.S. 758, 764 (2021) (cleaned up). A "colorable textual basis" alone won't suffice: "Extraordinary grants of regulatory authority are rarely accomplished through 'modest words,' 'vague terms,' or 'subtle device[s].'" *West Virginia v. EPA*, 597 U.S. 697, 722-23 (2022). Again, there is no serious question that the prediction markets' position would give the CFTC vast regulatory authority over a sports wagering industry that, as in other applications of the "major questions" doctrine, involves "billions of dollars" and affects "millions of people." *King v. Burwell*, 576 U.S. 473, 485 (2015).[33] Our "'constitutional structure' and 'common sense'" strongly suggest that "Congress would not have delegated 'highly consequential power' through ambiguous language" slipped into a small corner of its sprawling definition of "swap." *Learning Resources, Inc. v. Trump*, 607 U.S. 229, 243 (2026).

---

[33] Illinois sports wagering generates around $1.3 billion a year in adjusted gross receipts and $429 million in state taxes. Illinois Gaming Board, Annual Report at 55 (2025), igb.illinois.gov/content/dam/soi/en/web/igb/documents/reports/annual-reports/igb-annual-reports/2025-igb-annual-report.pdf.

These "clear statement" rules have particular force here because the Seventh Circuit takes a "cautious[ ]" approach to Commodity Exchange Act preemption. *Effex Capital*, 933 F.3d at 894. The prediction markets' approach is anything but. If sports wagers are "swaps," then they generally *must* be traded on CFTC-regulated markets. *North American*, 815 F. Supp. 3d at 1184. And if the prediction markets are correct that state laws are displaced, then the multi-billion-dollar sports wagering industry could play out under the federal government's authority. *Id.*; *see Schuler I*, 2026 WL 657004, at *6 (prediction markets' argument would force "all sports bets" to be traded on federally regulated markets "and every sportsbook in the country would be put out of business").[34] A few words in the Commodity Exchange Act are too slender a reed to exact this monumental shift. *E.g.*, *Martin*, 793 F. Supp. 3d at 682 ("highly unlikely that Congress would have overridden state gambling laws without at least some indication in the text").

## II.     Plaintiffs have not established that they are suffering any irreparable harm.

"A preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Cassell v. Snyders*, 990 F.3d 539, 544 (7th Cir. 2021) (cleaned up). Plaintiffs here will not suffer *any* harm (much less irreparable harm) in the absence of a preliminary injunction. Therefore, they fall woefully short of establishing that this is one of those rare cases where emergency relief is warranted.

The Illinois Gaming Board sent cease-and-desist letters concerning sports event contracts to Kalshi and OG in April 2025 (more than fifteen months ago) and to Polymarket in January 2026 (about six months ago). *CFTC* ECF 37-1 at 240, ¶ 56 & n.12; *Kalshi* ECF 1-1. Kalshi's lawyers responded to the Illinois Gaming Board, and the parties negotiated a standstill

---

[34] The prediction markets think that the CFTC can change the definition of "swap" to eliminate this issue. *See* 15 U.S.C. §§ 8302(d)(1) & 8321(b). If so, that would be a violation of the nondelegation doctrine. *E.g.*, *FCC v. Consumers' Research*, 606 U.S. 656, 672-73 (2025); *see QCX*, 2026 WL 1895958, at *7.

agreement. *Kalshi* ECF 1-2 at 38-42. The parties expanded the agreement in March 2026 to include the Illinois Attorney General and to extend it through the time "while Coinbase's motion for preliminary injunction is pending before Judge Pacold." *Id.* at 35.[35] The parties were clear that the purpose of the agreement was to "avoid[ ] burdening the courts with unnecessary litigation." *Id.* at 37. Defendants have similar standstill agreements with OG and Polymarket.

Irreparable harm may be established when state "enforcement actions are *imminent*." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (emphasis added). Defendants' standstill agreements evidence that enforcement actions are *not* imminent here.[36] Kalshi thinks that it can surmount this hurdle thanks to Public Act 104-468, which (among other things) amended the Sports Wagering Act, 230 ILCS 45/art. 25, effective last month.[37] But the standstill agreement plainly covers enforcement actions under that statute (including any amendments). As for the CFTC, it fears that Illinois officials might change their minds or pursue enforcement actions against *other* prediction markets sometime down the road. But "a plaintiff cannot obtain a preliminary injunction by speculating about hypothetical future injuries." *East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 705-06 (7th Cir. 2005).

Regardless, the "irreparable harm" analysis "takes into account how urgent the need for equitable relief really is." *Michigan v. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011). The Illinois Gaming Board issued its cease-and-desist letters between six and fifteen

---

[35] Sovereign immunity prevents private prediction markets from obtaining relief against the State of Illinois. *E.g.*, *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985).

[36] Issuing a preliminary injunction would threaten judicial economy by discouraging state officials from entering into future standstill agreements. *Cf. American Academy of Pediatrics v. Uthmeier*, 178 F.4th 1113, 1132 (7th Cir. 2026) (Scudder, J., dissenting), *vacated*, 2026 WL 1971202 (7th Cir. July 8, 2026).

[37] The amendments simply increase taxes on certain licensees under the Sports Wagering Act. 230 ILCS 45/25-90(d-20). Although the legislature also ensured that prediction markets were covered by the statute, *id.* 25-10 (definition of "exchange wager"), this was clarifying of existing law, *see* Public Act 101-31, art. 25, at 230 (definition of "sports wagering" has always included "exchange wagering").

months ago. Plaintiffs' delay in seeking "emergency" relief "undercuts the 'sense of urgency' implied by" their motions "and 'suggests that there is, in fact, no irreparable injury.'" *Kerwin ex rel. NLRB v. Trinity Health Grand Haven Hospital*, 174 F.4th 942, 958-59 (6th Cir. 2026).[38]

Kalshi and the Coalition rattle off a list of "harms" that prediction markets might suffer if Illinois officials cracked down: the CFTC might revoke their designations, they might have to implement geofencing to exclude Illinois residents, and they might lose goodwill with their users. Courts have resoundingly rejected these arguments, and they should fare no differently here. *E.g.*, *Williams*, 2026 WL 2017466, at *10. Anyway, "it is difficult to portray what [the prediction markets] may face as *harm* unless the application of [Illinois] law against [the prediction markets] would indeed be unconstitutional." *QCX*, 2026 WL 1895958, at *13. And, as explained above, it is overwhelmingly clear that this just isn't the case.[39]

### III.    The public interest and balance of equities do not support preliminary relief.

On the other side of the ledger, a state suffers "'irreparable injury'" when it "'is enjoined by a court from effectuating statutes enacted by representatives of its people.'" *Maryland v. King*, 567 U.S. 1301, 1303 (2012). And the state law that the prediction markets target is no ordinary legislation. Unregulated gambling can be dangerous and creates considerable risks for the people of Illinois; the state therefore has a substantial interest in protecting the public and maintaining the integrity of gaming activities it allows. *E.g.*, *Midwest Electronics Gaming, LLC v. Illinois Gaming Board*, 276 N.E.3d 35, 45, 2025 IL App (1st) 241076, ¶ 32; *see Nken v. Holder*, 556 U.S.

---

[38] Consider too that, in the time that passed between the CFTC's commencing this litigation and filing its motion, Liz Truss could have served out her entire term as prime minister of the United Kingdom (and then some). Even the hardiest head of lettuce could not have outlasted the CFTC's eleven-week delay.

[39] Plaintiffs also have not shown that a preliminary injunction is necessary "to ensure that, at the end of the case, the court can still grant an adequate remedy." *Delaware State Sportsmen's Association, Inc. v. Delaware Department of Safety & Homeland Security*, 108 F.4th 194, 200 (3d Cir. 2024).

31

418, 435 (2009) (harm to opposing party and public interest merge when state is defendant).

Plainly, "the public has an interest in ensuring that unlicensed sports wagering does not occur on CFTC-designated exchanges." *North American*, 815 F. Supp. 3d at 1187. Sports wagering may be "particularly addictive and especially attractive to young people with a strong interest in sports." *Murphy*, 584 U.S. at 460.[40] This is why the Illinois Gaming Board works tirelessly "to preserve the integrity and security of sports wagering in this State and to promote and maintain a competitive sports wagering market." 230 ILCS 45/25-45(d); *see, e.g.*, *id.* 25-100 (creating sports wagering "voluntary self-exclusion program" to protect addicted residents); 11 Ill. Admin. Code 1900.1130 (authorizing Illinois Gaming Board to prohibit sports wagering when it is "contrary to public policy, unfair to consumers, or affects the integrity of a particular sport or the sports wagering industry"). These are precisely the safeguards that the prediction markets and their allies in the federal government want the Court to help them evade.

### CONCLUSION

The Court should deny the CFTC's, Kalshi's, and the Coalition's preliminary injunction motions.

Dated: July 17, 2026

Respectfully submitted,

 /s/ Darren Kinkead
Darren Kinkead
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
(773) 590-6967
Darren.Kinkead@ilag.gov

---

[40] *See* Lipton & Odusola, *supra* note 3 ("retail traders (market takers) on Kalshi have lost over half a billion dollars" and "[m]ore than two-thirds of those losses ($371.6 million) were from sports alone").