**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

COINBASE FINANCIAL MARKETS, INC.,

Plaintiff,

v.

KWAME RAOUL, in his official capacity as Attorney General of Illinois; et al.,

Defendants.

---

UNITED STATES OF AMERICA; et al.,

Plaintiffs, and

COALITION FOR FAIR MARKETS; NORTH AMERICAN DERIVATIVES EXCHANGE, INC., d/b/a OG,

Intervenor Plaintiffs,

v.

STATE OF ILLINOIS; et al.,

Defendants.

---

KALSHIEX LLC,

Plaintiff,

v.

KWAME RAOUL, in his official capacity as Attorney General of Illinois; et al.,

Defendants.

Case Nos. 1:25-cv-15406; 1:26-cv-03659; 1:26-cv-07363

Judge Martha M. Pacold

## MEMORANDUM OPINION AND ORDER

The plaintiffs and intervenor plaintiffs in cases 1:25-cv-15406 (Coinbase docket), 1:26-cv-03659 (CFTC docket), and 1:26-cv-07363 (Kalshi docket) have requested similar preliminary injunctions against Illinois and Illinois officials. Coinbase's motion, *see* [27],[1] the United States's and intervenor plaintiffs' motions, [31]; [60], and Kalshi's motion, *see* [19], are granted in part and continued in part for the reasons explained below.

## FACTUAL AND PROCEDURAL BACKGROUND

Kalshi lets people put money behind their predictions. For example, anyone with a Kalshi account this summer could have bet on whether Spain or Argentina would win the World Cup. Or they could have bet on whether LeBron James would sign with the Miami Heat. That second bet, a few months ago, cost around 10¢. And the contract, once James signed with the Philadelphia 76ers, settled for $0.00. Anyone who bet on James signing with the 76ers got $1.00.

The market sets the price. If a contract costs 35¢, users have collectively guessed that there is a 35% chance that the condition will happen. That 35% chance is not set by the house, like at a casino; Kalshi never decides that James is 35% likely to sign with the Heat. Instead, prices reflect those at which users buy and sell event contracts.

Some users buy contracts they think are undervalued and sell contracts they think are overvalued. For instance, if a user believes James is only 20% likely to sign with Miami but the contract is being sold for 35¢, the user can sell his contract on the belief that the contract is overvalued by 15¢. So can every other user. By trading contracts before they settle, then, users can bet on bets.

Shortly after Kalshi began listing prediction contracts based on sports, Coinbase [1-1] at 2, Illinois sent a cease-and-desist letter. Coinbase [1] ¶ 58; *see also* Coinbase [1-3] at 2 (similar letters to other entities). The state believed that Kalshi was in violation of the Illinois Sports Wagering Act. *See* 230 ILCS 45/25-10 (defining "sports wagering" in a manner that the state interprets to capture some of Kalshi's contracts); 230 ILCS 45/25-20 (requiring companies to obtain a license before "engag[ing] in any activity in connection with sports wagering");

---

[1] Docket entries refer to the Coinbase docket, CFTC docket, or Kalshi docket by noting "Coinbase," "CFTC," or "Kalshi" and a bracketed number, often followed by page or paragraph number pinpoint citations.

720 ILCS 5/28-1(a)(12) (making it a crime to "establish[], maintain[], or operate[] an Internet site that permits a person to . . . make a wager upon the result of any game"). Illinois threatened action against Kalshi and "anyone affiliated with [Kalshi's] operations." Coinbase [1-2] at 2.

While Kalshi sells bets, Coinbase offers a virtual wallet in which users can hold cryptocurrency. The two companies partnered so that Coinbase's one hundred million users can buy and sell contracts listed on Kalshi's platform with cryptocurrency stored on Coinbase. Coinbase [1] ¶ 5. Coinbase sued Illinois, seeking pre-enforcement review, injunctive relief, declaratory relief, and anything else "just and proper." Coinbase [1] at 38. The court heard argument on Coinbase's motion for a preliminary injunction. *See* Coinbase [51].

After oral argument, Illinois changed its laws. "[T]he Fiscal Year 2027 state budget . . . codified . . . amendments to 230 ILCS 45/25-90, part of Illinois's gambling laws." CFTC [31] at 10. The amendments impose a "transaction fee on every 'exchange wager,' defined as 'an agreement, contract, transaction, or swap that is offered, traded, or executed on a prediction market or exchange tied to a sporting contest or sporting event.'" *Id.* (citing 230 ILCS 45/25-10 & 45/25-90(d-20)). To be specific, the law imposes a "1.75% transaction fee on a prediction market or exchange's first five million 'exchange wagers' and a 3.5% fee on all subsequent 'exchange wagers' traded in the same fiscal year." *Id.* at 11. These new fees layered on top of existing ones. *See generally* 230 ILCS 45/25-90. Subsection 45/25-90(a) had already imposed a 15% fee on "gross sports wagering receipts." And subsection 45/25-90(d-7) had likewise imposed a fee of either 25¢ or 50¢ on each wager.

Meanwhile, other states have been taking action to regulate the contracts traded on Kalshi's website, prompting a nationwide wave of litigation. *See generally, e.g.*, *KalshiEX, LLC v. Hendrick,* 817 F. Supp. 3d 1014 (D. Nev. 2025). And after the court heard argument in Coinbase's case, the United States and Commodity Futures Trading Commission sued too. *See* CFTC [1]. So did Kalshi. *See* Kalshi [1]. After these cases were reassigned to the court, the newcomers agreed to stand on their briefs, Coinbase [76], alongside other ones. *See* Coinbase [47] (tribal amici); CFTC [60] (intervenor plaintiff). For that reason, the court did not hold oral argument a second time.

In the three cases, the plaintiffs advance similar positions, and the defendants are shared, so the court resolves the cases together. To understand that resolution, though, one must understand the relevant portions of the Commodity Exchange Act.

## STATUTORY BACKGROUND

Kalshi's platform is a "designated contract market." Designated contract markets serve as federally regulated marketplaces for people to buy and sell certain financial instruments. "Board[s] of trade appl[y]" for designation for various reasons. 7 U.S.C. § 7(a). Boards might want to, for example, signal that their instruments follow federal law. Or boards might offer the kinds of instruments that may be traded only on designated contract markets. *See* 7 U.S.C. § 2(e).

Designated contract markets have their own rules. They cannot ignore "core principles," one of which is following all rules that the CFTC imposes. *See* 7 U.S.C. § 12a(5). Nor may they list contracts that are "readily susceptible to manipulation." 7 U.S.C. § 7(d)(3).

Designated contract markets retain a lot of authority. If they wish to list new contracts, they can self-certify that "the new contract or instrument . . . complies with" the Commodity Exchange Act and accompanying regulations. 7 U.S.C. § 7a-2(c)(1). And although designated contract markets occasionally need prior approval to list a new contract or instrument, *see id.* § 7a-2(c)(4), they can list a contract that they determine is permitted under the rules.

The CFTC is responsible for regulating designated contract markets. At least some of that authority is exclusive. The Commodity Exchange Act gives the CFTC

> exclusive jurisdiction, except to the extent otherwise provided in the Wall Street Transparency and Accountability Act of 2010 . . . with respect to accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an "option", "privilege", "indemnity", "bid", "offer", "put", "call", "advance guaranty", or "decline guaranty"), and transactions involving swaps or contracts of sale of a commodity for future delivery (including significant price discovery contracts), traded or executed on a contract market designated pursuant to section 7 of this title or a swap execution facility pursuant to section 7b-3 of this title or any other board of trade, exchange, or market, and transactions subject to regulation by the Commission pursuant to section 23 of this title.

7 U.S.C. § 2(a)(1)(A). Not all the CFTC's authority is exclusive, though. Federal agencies, the fifty states, or Indian Tribes share some concurrent authority. The subparagraph continues:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2(a)(1)(A). Put together, the CFTC has exclusive jurisdiction over certain instruments traded on federally designated venues but otherwise shares authority with other agencies and other sovereigns.

Included among the instruments belonging to the CFTC's exclusive jurisdiction are "swaps." 7 U.S.C. § 2(a)(1)(A). Whatever swaps are, they can be traded only on designated contract markets: "It shall be unlawful for any person, other than an eligible contract participant, to enter into a swap unless the swap is entered into on, or subject to the rules of, a board of trade designated as a contract market under section 7." 7 U.S.C. § 2(e); *see also* 7 U.S.C. § 1a(18) (defining "eligible contract participant," an exception inapplicable here).

This case turns on the statutory definition of swaps. The Commodity Exchange Act defines a "swap" as

> any agreement, contract, or transaction—
> (i) that is a put, call, cap, floor, collar, or similar option of any kind that is for the purchase or sale, or based on the value, of 1 or more interest or other rates, currencies, commodities, securities . . . or other financial or economic interests or property of any kind;
> (ii) that provides for any purchase, sale, payment, or delivery . . . that is *dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence*;
> (iii) that provides on an executory basis for the exchange, on a fixed or contingent basis, of 1 or more payments based on the value or level of 1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property of any kind, or any interest therein or based on the value thereof, and that transfers, as between the parties to the transaction, in whole or in part, the financial risk associated

> with a future change in any such value or level without also conveying a current or future direct or indirect ownership interest in an asset (including any enterprise or investment pool) or liability that incorporates the financial risk so transferred, including any agreement, contract, or transaction commonly known as—
>
> (I) an interest rate swap . . .
> (VII) a currency swap . . .
> (XV) a credit default swap . . .
> (XVII) a weather swap . . .
>
> (iv) that is an agreement, contract, or transaction that is, or in the future becomes, commonly known to the trade as a swap;
> (v) including any security-based swap agreement which meets the definition of "swap agreement" as defined in . . . 15 U.S.C. 78c . . . of which a material term is based on the price, yield, value, or volatility of any security or any group or index of securities or any interest therein; or
> (vi) that is any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v).

7 U.S.C. § 1a(47)(A) (emphasis added). Even that long subparagraph is not comprehensive. The next subparagraph lists financial arrangements that the "term 'swap' does not include." *See* 7 U.S.C. § 1a(47)(B). And another section tasks regulators with "further defin[ing] the term[] 'swap.'" 15 U.S.C. § 8302. Regulators, for their part, have taken up that task once. *See generally Further Definition of "Swap," "Security-Based Swap," and "Security-Based Swap Agreement"; Mixed Swaps; Security-Based Swap Agreement Recordkeeping,* 77 Fed. Reg. 48,208 (Aug. 13, 2012).

This case mostly turns on the clause of the swap definition that includes contracts "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

The term "swaps" and its definition were added in 2010. The addition was included in a broader reform following the subprime mortgage crisis and subsequent recession. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 1666–69, 1672 (2010); David H. Carpenter et al., *The Dodd-Frank Wall Street Reform and Consumer Protection Act: Background and Summary*, U.S. Congress (July 16, 2026), https://www.congress.gov/crs-product/R41350.

Among the many risky bets involved in the 2008 crisis were credit default swaps. Credit default swaps hedged against the event a mortgage defaulted by paying out when mortgage holders could not. Federal Deposit Insurance Corporation, *Crisis and Response: An FDIC History, 2008–2013* at 22–23 (2017). More people defaulted on their mortgages than the market had predicted. *Id.* at 24–27. Problems for investors spread to the rest of the market, and so came crisis and then reform.

The reform included the term "swap," discussed above, and the so-called "Special Rule." 7 U.S.C. § 7a-2(c)(5)(C). The Special Rule reads:

> (i) Event contracts
> In connection with the listing of agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency . . . by a designated contract market or swap execution facility, the Commission may determine that such agreements, contracts, or transactions are contrary to the public interest if the agreements, contracts, or transactions involve—
>
> > (I) activity that is unlawful under any Federal or State law;
> > (II) terrorism;
> > (III) assassination;
> > (IV) war;
> > (V) gaming; or
> > (VI) other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest.
>
> (ii) Prohibition
> No agreement, contract, or transaction determined by the Commission to be contrary to the public interest under clause (i) may be listed or made available for clearing or trading on or through a registered entity.

When these additions were made, Kalshi did not yet exist, but betting contracts based on the outcomes of events did. As the CFTC has noted, it "first officially recognized event contracts in 1992 when it allowed the Iowa Electronic Markets, a futures market at the University of Iowa in which traders can buy and sell contracts pegged to events such as presidential elections." CFTC, *Press Release, U.S. Commodity Futures Trading Comm'n, CFTC Reaffirms Exclusive Jurisdiction over Prediction Markets in U.S. Circuit Court Filing* (Feb. 17, 2026), https://www.cftc.gov/PressRoom/PressReleases/9183-26.

The CFTC has exercised its authority under the Special Rule to "determine that" certain "agreements, contracts, or transactions are contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). It promulgated that a "registered entity shall not list for trading or accept for clearing on or through the registered entity" any "agreement, contract, transaction, or swap based upon an excluded commodity . . . that involves, relates to, or references terrorism, assassination, war, gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11(a)(1).

With that background, the court proceeds.

## ANALYSIS

A preliminary injunction requires plaintiffs to establish a likelihood of success, irreparable harm, a favorable tilt in the balance of the equities, and the public interest in favor of an injunction. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). In this case, the party presentation principle informs the court's equitable discretion. Both sides focused on a representative sports-related contract dependent on who will win or lose a title game, like "will the Chicago Cubs win the 2026 World Series?" *See* Coinbase [53] at 24:17–20; Coinbase [37] at 9. So, the court "decide[s] only questions presented by the parties" and tailors any relief accordingly. *United States v. Sineneng-Smith*, 590 U.S. 371, 376 (2020) (quoting *United States v. Samuels*, 808 F.2d 1298, 1301 (8th Cir. 1987) (Arnold, J., concurring in the denial of reh'g en banc)).

### I. The Commodity Exchange Act Likely Preempts Illinois's Laws

Illinois cannot enforce laws preempted by federal law. *See* U.S. Const., art. VI, cl. 2. There are "three variants of federal preemption": express preemption, field preemption, and conflict preemption. *Am. Agric. Movement, Inc. v. Bd. of Trade of City of Chicago*, 977 F.2d 1147, 1154 (7th Cir. 1992), *abrogation on other grounds recognized by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995) (clarifying that precedent "does not stand for th[e] blanket proposition" that courts "may resort to analysis under field and conflict preemption only if a statute is devoid of explicit preemptive language" (internal quotation marks and brackets omitted)).

The Seventh Circuit has already held that the Commodity Exchange Act does not expressly preempt state law. *See Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) ("We first noted that the Commodity Exchange Act does not expressly preempt

state law." (citing *Am. Agric.*, 977 F.2d 1147, 1154 (7th Cir. 1992))). *But see KalshiEX, LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *7 (9th Cir. Aug. 28, 2026) ("[T]he CEA expressly preempts state law regulating swaps 'traded or executed on' a DCM."). Nor does the Act preempt the field. *See Effex*, 933 F.3d at 894. So, the court decides only whether Illinois law conflicts with the Commodity Exchange Act.

The court starts with the language at hand, because a question about preemption is answered like "any other about statutory meaning, looking to the text and context of the law in question and guided by the traditional tools of statutory interpretation." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (plurality opinion); *accord Kansas v. Garcia*, 589 U.S. 191, 208 (2020). *But see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("[T]he purpose of Congress is the 'ultimate touchstone' in every pre-emption case.").

### A. Title contracts sold by Kalshi are likely "swaps"

Everyone agrees that whether Kalshi's core contracts are "swaps" turns on whether they are contracts "provid[ing] for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

The court interprets the text as a whole, but different parts of the text raise different questions. One is whether title contracts tie payment to "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." *Id.* Another is whether winning a game "associate[s] with a potential financial, economic, or commercial consequence." *Id.*

#### 1. Kalshi's title contracts likely tie payment to occurrences, nonoccurrences, and extents

First, Kalshi's title contracts tie payment to "the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency." Many dictionaries contemporaneous with the addition of these words define "event" and "contingency" in a way that captures who wins a game. *See, e.g.*, *Event*, Collins Dictionary (10th ed. 2009) ("the actual or final outcome").

Of course, words can have broad references and be used in narrower senses. Other contemporaneous dictionaries define "event" and "occurrence" in narrower ways. *See N. Am. Derivatives Exch., Inc. v. Nevada on Rel. of Nevada Gaming Control Bd.*, 815 F. Supp. 3d 1169,

1181–82 (D. Nev. 2025) (collecting definitions), *aff'd*, No. 25-7187, 2026 WL 2546926 (9th Cir. Aug. 28, 2026). They distinguish the result of an event from the event itself. *See id.* at 1183 ("[T]he ordinary meaning of event in terms of sports would be the sporting event itself, not who wins it."); *see also* Coinbase [37] at 10–14. If "event" refers to only the game itself, and excludes the results of a game, Kalshi's contracts cannot be swaps.

But the statutory definition does not read that way. *See KalshiEX LLC v. Schuler*, No. 26-3196, 2026 WL 2884087, at *9 (6th Cir. Sept. 25, 2026) ("[B]ecause nothing in the statutory text provides a clear indication that the event must be defined to exclude outcomes, we decline to read such a limitation into the statutory definition ourselves."). Although "event" and "contingency" could be interpreted narrowly to refer only to the game itself, the words sit next to phrasing that broadens them: "*the occurrence, nonoccurrence, or the extent of the occurrence of* an event or contingency." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). As another Court explained, "in addition to 'occurrence' and 'nonoccurrence,' Congress included the phrase, '*the extent of* the occurrence of an event or contingency,'" which "implies a result that is measurable along a spectrum." *KalshiEX LLC v. Johnson*, 832 F. Supp. 3d 954, 961 (D. Ariz. 2026) (quoting 7 U.S.C. § 1a(47)(A)) (emphasis in original). "If 'occurrence' and 'nonoccurrence' capture whether an event happens, 'the extent of the occurrence' extends to how an event resolves." *Id.* Looking at all these general words together, the court finds it unlikely that the Commodity Exchange Act uses all of them in their narrowest senses. *Cf., e.g.*, *Diamond v. Chakrabarty*, 447 U.S. 303, 308 (1980).

Nor would that narrow interpretation make sense. Differentiating between the results of games and the contingencies associated with those results is basically semantics. Imagine two contracts, both made on August 28 before the first pitch of a game between the Chicago Cubs and the Cincinnati Reds. One bets on the Cubs winning the game. The other bets on the Cubs's season-long record going up. Both contracts hedge against the same possibility: the Cubs losing. They pay out under exactly the same circumstances. Under defendants' interpretation, though, one is a swap and the other is not.

| | Title Contract | Record Contract |
|---|---|---|
| Contract Text | "Will the Cubs win the game against the Reds on August 28, 2026?" | "Will the Cubs's season-long record be 77-58 on August 29, 2026?" |
| Under the Court's Interpretation | A swap, because the win itself is an event | A swap, because the event is the season-long record |
| Under Defendants' Interpretation | Not a swap, because the game is the event and the win is a result of that event | A swap, because the event is the season-long record |

The court finds the distinction unlikely. Little separates the two contracts, and statutes do not usually draw lines so capriciously. When picking between two plausible interpretations, and one draws a consistent line, and the other does not, the court will favor consistency. *Cf. Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 226 (2014) ("This Court has long warned against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art." (internal quotation marks, ellipses, and brackets omitted)); *Abramski v. United States*, 573 U.S. 169, 180 (2014).

The rest of the Commodity Exchange Act casts further doubt on the narrowest senses of "event" and "contingency." Clauses (i) and (iii) of the swap definition describe instruments that by their terms depend on "financial or economic interests." 7 U.S.C. §§ 1a(47)(A)(i), (iii). In contrast, clause (ii) describes instruments that depend on events and contingencies that are "*associated with* a potential financial, economic, or commercial consequence[s]." 7 U.S.C. § 1a(47)(A)(ii) (emphasis added). The court finds that difference meaningful.

**2. A position on who wins a title game is likely "associated with a potential financial, economic, or commercial consequence"**

Winning a title game likely "associate[s] with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

Clauses like this one are often broad. *See, e.g.*, *Maracich v. Spears*, 570 U.S. 48, 60 (2013) (citing *California Div. of Labor Standards Enforcement v. Dillingham Constr., N.A., Inc.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring)). Here, "associated with" is followed by an even broader catch-all. Not just financial consequences count, but financial,

economic, and commercial consequences. Not just actual consequences count, but actual and potential consequences. The clause reads about as broadly as it could.

Structure elsewhere reinforces that breadth. One clause includes contracts "known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv). Another clause captures "any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)." *Id.* § 1a(47)(A)(vi). These clauses are expansive enough to overlap with other parts of the swap definition. In other words, the Act takes a belt-and-suspenders approach to capturing swaps.

But broad does not mean unlimited. The Supreme Court has told courts how to interpret this kind of scheme. The Court, when reading phrases like "associated with," cautions against "uncritical literalism." *Dillingham*, 519 U.S. at 325. Rather, the Court favors "limiting principle[s] consistent with the structure of the statute and its other provisions." *Maracich*, 570 U.S. at 60; *see also Chevron USA Inc. v. Plaquemines Par.*, 146 S. Ct. 1052, 1061 (2026) (cautioning against interpretations of such clauses so broad that they become "meaningless" (internal quotation marks omitted)).

So, the court finds limits to this otherwise broad definition. *Contra Assad*, 2026 WL 2543846, at *11. Any association, actual or potential, must be concrete and articulable. Speculative associations seen only by the "curbstone philosopher," on the logic that "everything is related to everything else," *Dillingham*, 519 U.S. at 335 (Scalia, J., concurring)—those that are too "tenuous, remote, or peripheral," *Plaquemines*, 146 S. Ct. at 1061 (internal quotation marks omitted)—will not do.

Next, the consequences must be "financial, economic, or commercial." 7 U.S.C. § 1a(47)(A)(ii). Those adjectives imply some significance and materiality. For a consequence to be financial, it must affect finances in a material way. What's more, "the law cares not for trifles," a "background . . . legal principle[] against which all enactments are adopted, and which all enactments (absent contrary indication) are deemed to accept." *Wisconsin Dep't of Revenue v. William Wrigley, Jr., Co.*, 505 U.S. 214, 231 (1992).

On one extreme are contracts that depend on another game happening. Take the NBA Finals, which is a seven-game, first-to-four series. A team is 3-0 before game four. If the team wins, it ends the series. But if the team loses game four, a fifth game ensues. Holding a fifth game, otherwise uncertain to occur, is "associated with a potential

financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).

On the other extreme are contracts relating to consequences so speculative that the contracts cannot fairly be said to be "associated with" a meaningful "consequence" at all. Coinbase effectively conceded at oral argument that there are contracts that lack sufficiently concrete and material consequences to qualify as swaps. The company agreed, for example, that a bet on what color sports drink is dumped on the coach's head after a Chicago Bears win is not associated with the requisite sort of consequences. *See* Coinbase [53] at 24:7–10. And Coinbase was right to admit as much.

The concreteness and materiality of the potential consequences limit what sorts of financial instruments fall under the swap definition. No narrower limiting principle has a persuasive hook in the law.

**3. Other possible limiting principles conflict with the Commodity Exchange Act**

Defendants find a limiting principle based on what they consider to be "the ordinary meaning of a swap." Coinbase [37] at 9. They think a swap naturally refers to something associated with consequences that are inherently economic. Coinbase [37] at 9, 15. From there, defendants suggest the definition of swap is limited to situations where "the event or contingency itself has some potential financial, economic, or commercial consequence without looking at . . . potential downstream financial consequences." *Id.* at 16 (internal quotation marks omitted).

"When a statute includes an explicit definition of a term," a court must "follow that definition, even if it varies from a term's ordinary meaning." *Van Buren v. United States*, 593 U.S. 374, 387 (2021) (internal quotation marks omitted). The ordinary meaning of "swap" can come in only "for the purpose of resolving an ambiguity in the definition." *Bond v. United States*, 572 U.S. 844, 870 (2014) (Scalia, J., concurring). And to resolve ambiguity, the court must take language "of many meanings" and pick among them. *Id.* But the court finds that the statutory definition is unambiguous. *See supra* section I(A)(1)–(2).

To make the statutory definition seem ambiguous, defendants turn to legislative intent. Coinbase [37] at 17–18; *see also, e.g.*, *Schuler*, 2026 WL 2884087, at *14. *But see Milner v. Dep't of Navy*, 562 U.S. 562, 574 (2011). As they tell the story, the financial crisis led to the definition's addition, and so Congress merely intended to target the sorts of instruments that led to the financial crisis. Credit default swaps were

bets on mortgages, which are "inherently economic events." Coinbase [37] at 17. Defendants thus derive the principle that only contracts based on "inherently financial, economic, or commercial" events can be swaps. *Id.* at 16.

One could tell another story about legislative intent. The amendments during the financial crisis could have been written to "cover[] the whole world of" potentially dangerous financial instruments. *Yates v. United States*, 574 U.S. 528, 556 (2015) (Kagan, J., dissenting). The crisis arose from unforeseen risks, so risky financial instruments might arise unexpectedly in the future, too. After all, the swap definition was added to a statute intended, as the Seventh Circuit described it, "to bring the" futures "markets under a uniform set of regulations." *Am. Agric.*, 977 F.2d at 1156.

The second story better follows the structure of the swap definition. Just one subpart of just one subclause describes credit default swaps. *See* 7 U.S.C. § 1a(47)(A)(iii)(XV). The rest of the definition describes different sorts of swaps. As amended, the Commodity Exchange Act reads more like a broad-spectrum regulatory intervention than a surgical response to the 2008 crisis.

That point about structure also answers the rule against surplusage, which is not a strict rule. *See Lamie v. U.S. Trustee*, 540 U.S. 526, 536 (2004). *But see QCX LLC v. Nessel*, No. 1:26-CV-710, 2026 WL 1895958, at *2 (W.D. Mich. June 17, 2026). The court finds it "more than a little strained to rely on the rule against legislative redundancies in construing statutory language that is a smorgasbord of redundancy, repetition, superfluity, duplication and redundancy." *United States v. Vidal*, 504 F.3d 1072, 1100 (9th Cir. 2007) (Kozinski, J., dissenting).

An alternative limiting principle is even unlikelier. Some have argued that credit default swaps posed "systemic risks in the financial sector" and so "swaps" identifies only similarly risky instruments. *See* Coinbase [37] at 18. This argument is incompatible with the Commodity Exchange Act, which never draws that distinction. Nor is it the court's role to resolve any other policy debates regarding the desirability of such trading. Congress gave those policy prerogatives to the CFTC, not the courts.

#### 4. Canons are not to the contrary

Finally, others have turned to the absurdity doctrine, the presumption against preemption, and the major questions doctrine. *KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *4, *6 (S.D. Ohio Mar.

9, 2026) (absurdity); Coinbase [47] at 12–13 (presumption against preemption); *Kalshiex LLC v. Assad*, No. 25-7516, 2026 WL 2543846, at *14–15 (9th Cir. Aug. 28, 2026) (major questions doctrine). All these moves rely on the intuition that Congress simply could not have meant to federalize gambling and anoint the CFTC as the nation's sole sports gambling regulator in response to the financial crisis. *See, e.g.*, 7 U.S.C. § 2(a)(1)(A)*; cf. Vill. of Rosemont v. Jaffe*, 482 F.3d 926, 937 (7th Cir. 2007) (recognizing "the gambling industry" as a traditional area of state regulation). Congress rarely "hide[s] elephants in mouseholes," after all. *Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001).

That intuition has some appeal, especially in an area of traditional state police power, but it is an odd fit with the Commodity Exchange Act. The statute, as interpreted here, does not federalize all gambling, or even all sports gambling. Instead, the statute governs gambling so far as it takes the form of swaps.

As another Court has recognized, "The pertinent question here is not 'Are sports-event contracts gambling?'—it is 'Are sports-event contracts swaps?'" *Schuler*, 2026 WL 657004, at *4 n.2. People may view these contracts as gambling, but little in the statutory definition turns on what people think. Instead, most of the definition turns on commercial function. *Compare* 7 U.S.C. § 1a(47)(A)(iv) ("commonly known to the trade as a swap"), *with* 7 U.S.C. § 1a(47)(A)(i)–(iii), (v), *and* 7 U.S.C. § 1a(47)(B)–(D).

To make the point more forcefully: swaps are swaps whether they are used to gamble. *Contra Assad*, 2026 WL 2543846, at *10 ("The crucial context that leads us to resist the broadest possible reading is that Kalshi has a gambling problem."). Imagine a casino registered as a designated contract market. *Cf., e.g.*, *Prediction Market*, U.S. Trademark Application Serial No. 99488100 (U.S. Pat. & Trademark Off. filed Nov. 10, 2025) (filed by Kalshi Inc.) ("conducting sports betting and gambling tournaments"). It could offer weather swaps to farmers and everyone else. Farmers would buy weather swaps to hedge against the risk of a bad season; others would buy weather swaps just for the thrill. *See, e.g.*, Kalshi, *Climate*, https://perma.cc/CH35-NFWP. The Commodity Exchange Act does not depend on whether the designated contract market is a casino rather than a typical futures exchange or whether someone bought a swap to gamble rather than hedge.

Indeed, many other contracts covered by the swap definition could theoretically be used to gamble. In theory, a renter could bet on mortgage defaults and buy credit default swaps, even though he has little financial exposure to the mortgage industry. *See* 7 U.S.C.

§ 1a(47)(A)(iii)(XV). Or he could buy natural-gas swaps, again without exposure to the fossil-fuel industry. *See id.* § 1a(47)(A)(iii)(XVIII); *see, e.g.*, Kalshi, *Natural Gas Price on October 30, 2026 at 5:00 PM EDT?*, https://perma.cc/VP49-C59S. The upshot is that regulating swaps will sweep in some gambling. Swaps can be, as courts used to observe, "in all essentials gambling transactions." *Christie Grain & Stock Co. v. Bd. of Trade of City of Chicago*, 125 F. 161, 168 (8th Cir. 1903), *rev'd*, 198 U.S. 236 (1905). Whatever the potential for gambling, a swap is a swap, and the Commodity Exchange Act requires it to be traded on a designated contract market, beyond state regulation.

Besides, sports bets fit the Commodity Exchange Act better than sometimes assumed. The Commodity Exchange Act addresses this possibility. The statute "give[s] the CFTC discretion whether to ban altogether gaming contracts." *Assad*, 2026 WL 2543846, at *19 (Lee, J., concurring) (citing 7 U.S.C. § 7a-2(c)(5)(C)(i)). Kalshi "has not relied on this provision because CFTC, exercising its authority under the Special Rule provision, has issued a rule banning gaming contracts." *Id.* But the provision belies that the Commodity Exchange Act has nothing to do with gambling. Quite the contrary, the same statutory scheme addresses "gaming."

At a financial level, sports bets can resemble credit default swaps. Broadcasters depend on the total number of games played in a best-of-seven matchup like the NBA Finals and the World Series. *See, e.g.*, Darren Rovell, *Putting NBA Conspiracy Theory to the Test*, ESPN (June 6, 2001), https://perma.cc/R664-UJ8H ("The difference in advertising revenue between a four-game series and a seven-game series would cost NBC between $25 million and $35 million."). Arena and concession companies often get paid a percentage of sales during games, meaning their revenue correlates with the number of games, too. Meanwhile, sponsors' returns on endorsements depend on players performing well.

All these people could bet against their own revenue, like the farmer who hedges against the risk of a brutal season, and like the financier who hedges against the risk of mortgage default.[2] To them, the

[2] Participants' revenue can also depend on performance. Golfers and their caddies make money based on tournament prize money. So do tennis players and their coaches. More broadly, many players have contract provisions that award bonuses for strong performance. Contracts with participants would likely be "readily susceptible to manipulation." 7 U.S.C. Code § 7(d)(3). That prohibition is for the CFTC to enforce, not the court, because the argument is not seriously raised in this case. *See Sineneng-Smith*, 590 U.S. at 376.

contracts would work similarly to the credit default swaps involved in the 2008 crisis: both reduce financial exposure. *See, e.g.*, Ben Shimkus & Jack Newsham, *An NYC Bar Promised Free Drinks If the Knicks Win. Its Owner Is Using Kalshi to Hedge the Risk*, Bus. Insider (June 2, 2026), https://perma.cc/A4L6-SZ8T; *see also* 7 U.S.C. § 5 (a legislative finding that "[t]he transactions subject to this chapter . . . are affected with a national public interest by providing a means for *managing and assuming price risks*, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities" (emphasis added)). Based on that financial similarity, the swap definition is "exactly the sort of place" Congress would expect to regulate these financial instruments by delegation to the CFTC. *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 22 (2020).

Moreover, this case is unlike the major questions doctrine cases decided so far. In other cases, agencies have taken old, ancillary language and found new, broad powers over existing fields. *See, e.g.*, *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 722–23 (2022); *see also id.* at 735 (refusing to interpret "best system of emission reduction" as a power to "[c]ap carbon dioxide emissions at a level that w[ould] force a nationwide transition away from the use of coal"). By contrast, when the CFTC gained "exclusive jurisdiction" over "swaps" in 2010, Kalshi did not exist. Most sports bets were wagers placed in a sportsbook instead of traded on a designated contract market. Since then, swaps and designated contract markets have become the site of sports betting. But the meaning of words enacted in 2010 does not turn on the behavior of companies like Kalshi—or even technological development. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]hat a statute can be applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." (internal quotation marks omitted)).

Otherwise, technological and commercial change would revise what laws mean. Suppose, for example, an old law federalized vehicle regulations during the birth of the auto industry. With hindsight, everyone knows that the car industry has become important. But that newfound importance would not bear on the meaning of the old law, which always entrusted regulation to federal agencies. Nor should technological and commercial change encourage courts to carve out ad hoc exceptions to laws.

### B. Seventh Circuit precedent establishes that state laws that "govern or supervise the operation of or trading on a" designated contract market, in the sale of swaps, are preempted

With the statutory interpretation in mind, the court applies Seventh Circuit precedent. A state law conflicts with a federal law, and is therefore preempted, when it either "is impossible to comply with both federal and state law" or the state's law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Am. Agric.*, 977 F.2d at 1154.

In *American Agriculture*, the Seventh Circuit has already addressed, in depth, the conflict preemptive effect of the Commodity Exchange Act. The case concerned state law claims against the Chicago Board of Trade, which was a designated contract market. The Chicago Board of Trade was tasked with "enact[ing] and enforc[ing] rules to ensure fair and orderly trading." The Board's Business Conduct Committee became concerned that one market participant held too high a proportion of outstanding soybean futures, thus "seriously compromis[ing]" the "stability of the soybean futures and cash markets." *Id.* at 1150–51. So, the Board "issued an Emergency Resolution" ordering participants with a certain amount of soybean futures "to liquidate their positions." *Id.* (quotation omitted). The resolution "led to a price decline in the July 1989 futures market" that "worked to the benefit of" certain market participants and to "the detriment" of others. *Id.* Then the plaintiff sued for breach of fiduciary duty and negligence under state common law. *Id.* at 1152. The Court had to decide whether the state action was preempted.

The Seventh Circuit routed its preemption analysis through the exclusive jurisdiction clause. The Seventh Circuit held that laws "govern[ing] or supervis[ing] the operation of or trading on a" designated market were preempted. 977 F.2d at 1154–57. As described previously, the Act contains clauses that confer regulatory authority on the CFTC. *See, e.g.*, 7 U.S.C. § 7. They provide the CFTC with the ability to designate, and create rules for, contract markets. *See Am. Agric.*, 977 F.2d at 1154. Put differently, the CFTC may designate and regulate certain *venues*, designated contract markets, for the sale of certain types of contracts. The Act also contains a clause conferring "exclusive jurisdiction" on the CFTC over certain instruments "traded or executed on a" designated contract market. *See* 7 U.S.C. § 2(a)(1)(A). In other words, the CFTC has exclusive jurisdiction over certain *instruments* traded on designated *venues*. *Id.* It is that clause the Seventh Circuit decided is preemptive. *See Am. Agric.*, 977 F.2d at 1155.

The Seventh Circuit considered the Commodity Exchange Act in its original context. "[T]he early 1970s," the Seventh Circuit remembered, saw "a drastic surge in commodities trading, rapidly rising food costs, and a highly publicized and costly futures trading scandal." *Id.* at 1156. Based on "these circumstances," the Seventh Circuit stated, the Act's "proponents were concerned that the states . . . might step in to regulate the futures markets . . . subject[ing] the national futures trading apparatus to conflicting regulatory demands." *Id.* The response "was to put all exchanges and all persons in the industry under the same set of rules and regulations," the Seventh Circuit explained. *Id.* (internal quotation marks omitted). With that context in view, the Seventh Circuit reasoned that "permitting the . . . state law claims against" the designated contract market "would frustrate Congress' intent to bring the markets under a uniform set of regulations." *Id.* Ultimately, the Seventh Circuit held that laws that "directly affect trading on or the operation of a futures market . . . would stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* at 1156–57 (internal quotation marks omitted).

The Seventh Circuit did not think that the Commodity Exchange Act preempts all "cases involving futures contracts," though. *Id.* at 1155. The Seventh Circuit turned to the "savings clause," which states that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State." 7 U.S.C. § 2(a)(1)(A). That language, the Seventh Circuit decided, "compels the conclusion that Congress intended to preempt some, but not all, state laws that bear upon the various aspects of commodity futures trading." *Id.* at 1155. Then the Seventh Circuit explained that state law is not preempted when it "would affect only the relationship between brokers and investors or other individuals involved in the market." *Id.*

Taken together, the Seventh Circuit's statements in *American Agriculture* yield the following principle: laws that regulate the trading of certain instruments on certain venues are preempted when those laws "directly affect trading on or the operation of a futures market." *Id.* at 1156. The first part of that principle, the relevant instruments and venues, follows from the text of 7 U.S.C. § 2. The second part of that holding, what it means to "directly affect trading on or the operation of a futures market," is explained by *American Agriculture* and *Effex Capital*.

There are other possible readings of *American Agriculture*. For example, one could read *American Agriculture* to hold that only the *venue* of trading matters—that is, whether the trading is done on a designated contract market alone, and not also the type of *instrument*

traded on that venue. But the Seventh Circuit did not have occasion to consider what would happen if an instrument not enumerated by the Commodity Exchange Act were traded on a designated contract market. *American Agriculture* concerned soybean futures, which are commodities for future delivery. 977 F.2d at 1151; 7 U.S.C. § 2(a)(1)(A). And the venue-only approach is inconsistent with the Seventh Circuit's later preemption cases and preemption principles generally.

In *Effex Capital*, the Seventh Circuit described *American Agriculture*'s holding as being about markets for particular financial instruments—"futures market[s]," *i.e.*, markets for "commodity futures"—and not just designated contract markets *simpliciter*. 933 F.3d at 894 (quoting *Am. Agric.*, 977 F.2d at 1155). The *Effex* court also reaffirmed that the preemptive effect of the Commodity Exchange Act stems from 7 U.S.C. § 2(a)(1)(A). *Id.* at 894. And the text of 7 U.S.C. § 2(a)(1)(A) admits of no other result. That clause specifies which sorts of contracts constitute the relevant "futures market" over which the CFTC has exclusive jurisdiction—namely, the market for "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery" sold on designated platforms. 7 U.S.C. § 2(a)(1)(A) (internal quotation marks omitted). Meanwhile, the savings clause clarifies that other "jurisdiction conferred" on the "States" remains intact. The savings clause suggests, then, that the Act's preemptive effect not only stems from, but is also limited to, what is described in 7 U.S.C. § 2(a)(1)(A). As the Supreme Court has explained, where Congress specifies what is preempted, courts should not expand upon Congress's limited mandate. *See Wyeth v. Levine*, 555 U.S. 555, 574 (2009). Enumerating one thing tends to exclude the other.

The result is also sensible. What can be sold on and off a designated contract market is largely overseen by the CFTC. Were anything the CFTC permits to be sold on a designated contract market automatically shielded by preemption, the CFTC could manipulate the practical scope of federal preemption simply by not removing certain contracts from designated contract markets. By the same token, many designated contract market listings are self-certified. *See* 7 U.S.C. § 7a-2(c)(1). And so private parties could also, without CFTC action, manipulate the practical scope of federal preemption, just by improperly listing certain contracts.

The upshot is that Illinois's laws are not preempted just because they impact contracts traded on Kalshi's website. It is not enough to raise the specter of federal preemption that Kalshi's sports-related contracts are literally traded on a designated contract market. Now that the court has concluded that Kalshi and Coinbase sell "swaps," the court

must answer whether Illinois's laws "directly affect trading on" those contracts, or whether Illinois's laws impact "the operation of [Kalshi's]" market. The court addresses those questions next.

### C. Some of Illinois's threatened laws impermissibly control the sale of Kalshi's swaps; others raise further questions

Defendants threaten to enforce two general sets of provisions against plaintiffs. First are licensing requirements requiring Kalshi and other designated contract markets to obtain a license, which then subjects them to numerous trading requirements, to offer their contracts. *See* 230 ILCS 45/25. That licensing requirement is backed up by a criminal provision making it a crime to "establish[], maintain[], or operate[] an Internet site that permits a person to . . . make a wager upon the result of any game." 720 ILCS 5/28-1(a)(12). Illinois has threatened to enforce these provisions against entities like Coinbase that are "affiliated with [Kalshi's] operations." Coinbase [1-2] at 2. Second are fees—both flat and percentage-based—on wagers. CFTC [60] at 8–10 (citing 230 ILCS 45/25-10 & 45/25-90). The first set of provisions likely constitutes impermissible control over Kalshi or the trading of swaps; the second poses further questions.

Illinois threatens to enforce 230 ILCS 45 against Kalshi. Kalshi, under that set of provisions, must first obtain a license before doing business in Illinois. 230 ILCS 45/20. As a condition of the license, Kalshi also must not allow anyone under 21 years old to buy and sell its contracts and may "only accept a wager from a person physically located in the State." 230 ILCS 45/25-25(e). Kalshi must follow many other rules under this set of provisions: for example, provisions limit the types of sports games which can underlie Kalshi's contracts as well as regulate the data sources that can be used in managing those contracts. *See, e.g.*, 230 ILCS 45/25–25(d), (d–5), (f). The threatened criminal provisions make it a crime to violate the civil ones. 720 ILCS 5/28-1(a)(12).

As the Seventh Circuit explained in *American Agriculture*, state regulations are preempted when they subject swap trading to "conflicting regulatory demands." 977 F.2d at 1156. The Seventh Circuit held that state regulations cause the requisite sort of conflict when they "bear[] upon the actual operation of the" designated market's sale of certain instruments. In other words, under precedent, when state regulations *add to* the CFTC's requirements for swap trading on designated contract markets, state regulations cause conflict. That is because, the Seventh Circuit reasoned, "Congress' intent" was to "bring the markets under a uniform set of regulations." *Id.*

In *American Agriculture*, a private litigant attempted to sue a designated contract market under state common law. *Id.* at 1156. The Seventh Circuit explained that federal law preempted state common law when the suit ran against the designated contract market itself. *See id.* Those common law claims against the designated contract market stood in contrast, however, to similar common law claims "between brokers and investors." *Id.* Such common law duties could only "affect . . . private relationships" and therefore would not "appreciably hamper the efficient operation of the futures market." *Id.* The Seventh Circuit distinguished state laws that targeted private principal-agent relationships from state laws that regulated the market itself.

Illinois's licensure rules and their related criminal provisions regulate the market itself. Illinois attempts to regulate how Kalshi's swaps can be structured and what sorts of sporting events they can relate to. Illinois also attempts to control whom Kalshi can allow to buy and sell swaps with age limits and geographical restrictions. Compliance would accordingly force Kalshi to build a market solely for Illinoisans—all at the threat of criminal penalties, against Kalshi itself, for non-compliance.[3] Illinois's threatened rules do not merely impose duties between private individuals, such as brokers and investors. *Id.* at 1156. They impose "conflicting regulatory demands" that "directly affect" trading on Kalshi, market wide, in a way similar to the regulations the Seventh Circuit found preempted in *American Agriculture*. *Contra* Coinbase [37] at 24–25.

Defendants respond that, under a current CFTC regulation, Kalshi's contracts are illegally listed and that, accordingly, its laws cannot interfere with trading that is not permitted in the first place. *Id.* at 23. Defendants may have a case that Kalshi is impermissibly listing certain contracts. The Special Rule permits the CFTC to "determine" "[i]n connection with the listing of . . . swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency" "that such agreements, contracts, or transactions are contrary to the public interest if the . . . contracts . . . involve" "gaming." 7 U.S.C. § 7a-2(c)(5)(C)(i)(V). The CFTC determined that designated contract markets should be barred from listing gaming contracts. 17 C.F.R. § 40.11(a)(1). And Kalshi offers many swaps that may relate to gaming.

[3] For this reason, Illinois law might also conflict with the regulation requiring designated contract markets to provide "impartial access to [their] markets and services." 17 CFR § 38.151(b).

But defendants' argument has several issues. First, Illinois's law still regulates what the CFTC can and cannot permit designated contract markets to do. The laws, then, subject Kalshi to non-uniform regulation. Even assuming defendants are right that Kalshi's contracts are impermissibly listed under § 40.11(a)(1), Illinois law in effect controls what the CFTC can permit on designated contract markets. Defendants are therefore attempting to exercise control over the operation of the trading of swaps on federally regulated markets. And that control is not permissible under precedent. Second, the CFTC has an immense amount of discretion over what can and cannot be traded on a designated contract market. *See* 7 U.S.C. § 7a-2(c)(5); 17 C.F.R. § 40.11(c). But the CFTC has never held that Kalshi's contracts are impermissible gaming contracts. It has never ordered Kalshi to remove its contracts. And it also supports Kalshi's position in this litigation. It would be odd indeed, then, to adopt defendants' theory, which essentially boils down to a claim that the CFTC and Illinois have consistent regulations. The court is thus left without a reason to think Illinois's licensing laws are not preempted.

Next are Illinois's fees. The parties devoted significantly less briefing to this issue, so the court will direct further targeted briefing on this issue and the following are only preliminary views. Generally speaking, a state can impose a cost on an activity without creating a conflict. Take *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645 (1995). In that case, the Supreme Court considered the preemptive effect of the clause providing that ERISA "shall supersede any and all State laws insofar as they . . . relate to any employee benefit plan." 514 U.S. at 652 (quoting 29 U.S.C. § 1144(a)). At issue were state surcharge statutes imposing fees on patients with ERISA-governed healthcare plans. *See id.* at 649–51. The Court explained that ERISA's preemption provision "indicate[d] Congress's intent to establish the" "exclusive[]" "regulation of employee welfare benefit plans." *See id.* at 656. ERISA aimed to eliminate "the threat of conflicting and inconsistent State and local regulation." *Id.* at 657 (internal quotation marks omitted). But merely imposing a state fee would not constitute a conflicting and inconsistent state regulation: such fees have "indirect economic influence" and "do[] not bind plan administrators to any particular choice and thus function as a regulation of an ERISA plan itself." *Id.* at 659. The surcharge was not preempted. *Id.* at 659–62. Absent clarification that "cost uniformity" was an aim of ERISA, "laws with only an indirect economic effect on . . . relative costs . . . in a given State are a far cry from those 'conflicting directives' from which Congress meant to insulate ERISA plans." *Id.* at 662.

A similar logic might apply in this case, subject to further briefing. ERISA, as described by the Court in *Travelers*, could be like the Commodity Exchange Act, at least as described by the Seventh Circuit in *American Agriculture*. Both laws aimed to create nationally uniform regulations. *See Am. Agric.*, 977 F.2d at 1156 (deciding that Congress intended to standardize "regulatory demands" in "the national futures trading apparatus"). Regulatory uniformity, however, does not necessarily entail uniformity in cost. *See, e.g.*, *Travelers*, 514 U.S. at 662 ("Cost uniformity was almost certainly not an object of pre-emption."). So, a similar result might follow: the transaction fees might pose no necessary conflict just because they cause indirect economic effects on Kalshi and its users. The other laws Illinois seeks to enforce cause a conflict because they regulate what can be sold, as well as where it can be sold and to whom. Taking a cut of Kalshi and Coinbase's profits, without more, might not pose the same conflict as regulating an entire market.

The Supreme Court left open that a sufficiently draconian fee could pose a conflict. If a fee on an ERISA-covered healthcare plan would "force an ERISA plan to adopt a certain scheme of substantive coverage or effectively restrict its choice of insurers," the Court explained, that "state law might indeed be pre-empted." 514 U.S. at 668. In other words, where a fee effectively regulates the operation of the market to circumvent the bar on the state directly regulating the market, the fee may be preempted. The court sees no reason why the same would not be true here. What defendants cannot do overtly, they cannot do covertly.

Targeted argument, and potentially evidence on, the various fees Illinois seeks to impose—should the parties seek to present it—would assist the court in evaluating the impact of Illinois's threatened fees. As the movants for a preliminary injunction, plaintiffs bear responsibility for demonstrating that they are entitled to one. *Winter*, 555 U.S. at 20. That burden has not yet been satisfied. A majority of the fees at issue have only been briefed in a significant capacity by the intervenor plaintiffs. *See* CFTC [60] at 8–10. The court did not hear argument on the impact of these fees at oral argument in February 2026. And plaintiffs acknowledge that the effect of the fees is fact sensitive. *See* CFTC [31] at 21 (noting that the fees might, "[d]epending on how" they "are calculated," "effectively operat[e] as an outright ban" on Kalshi's swaps). Because only "some effect on the administration" of swaps trading on Kalshi might not pose the requisite sort of conflict, *see De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 816 (1997), but a significant enough effect might pose a conflict, the court finds that further argument on these various fee provisions is necessary

for plaintiffs to demonstrate a likelihood of success on whether these fee provisions are preempted.

To conclude: Under precedent, the regulations are likely preempted if they control a designated contract market's sale of "swaps." Plaintiffs have demonstrated that Kalshi is a designated contract market, that its core sports-related contracts are "swaps," and that Illinois is likely attempting to exercise control over Kalshi's sale of those "swaps." Much of Illinois law likely conflicts with the Commodity Exchange Act and is accordingly likely preempted. Plaintiffs have therefore demonstrated a likelihood of success on the merits of their claim. Likelihood of success on the merits, however, is just one of four preliminary-injunction factors. The court next turns to the other three.

## II. Plaintiffs Face Irreparable Harm from Illinois's Threatened Enforcement

"[P]laintiffs seeking preliminary relief" must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original). Harm is irreparable if no "adequate remedy at law" can return plaintiffs to their rightful positions. *Abbott Lab'ys v. Mead Johnson & Co.*, 971 F.2d 6, 11 (7th Cir. 1992).

Starting with the private plaintiffs: They must choose between ceasing business operations and facing imminent civil and criminal penalties under laws that are likely preempted. And when "enforcement actions" under preempted laws "are imminent—and at least," like here, "when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses—there is no adequate remedy at law." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

Damages will not be adequate. Sovereign immunity protects Illinois from damages suits, meaning the state is judgment proof. *See Somerset House, Inc. v. Turnock*, 900 F.2d 1012, 1018 (7th Cir. 1990) ("[T]emporary loss of funds could be irreparable . . . where the defendant is judgment proof."); *see also Kentucky v. Graham*, 473 U.S. 159, 169 (1985).

Sovereign immunity aside, the private plaintiffs have alleged incalculable losses to profits while the suit lasts, rendering a legal remedy difficult to provide. *See Somerset House*, 900 F.2d at 1018 (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984) (recognizing that lost profits can constitute irreparable harm)); *see*

*also* Coinbase [27] at 28–29. The same goes for the United States. *Cf. Trump v. CASA, Inc.*, 606 U.S. 831, 861 (2025).

All that defendants mostly concede. Rather, they argue that Coinbase is to blame for its own injuries because it knew about the laws Illinois passed for months yet "inexplicably . . . decided to file this lawsuit at the last minute and demand instant relief." Coinbase [37] at 29. Defendants then argue that is doubly true for the United States and Kalshi, which waited even longer to sue. *See* CFTC [67] at 30–31; Kalshi [39] at 30–31.

In essence, defendants argue that laches should bar relief. Laches is a defense that "will block or limit the equitable relief given to a plaintiff who unreasonably delays in suing, where that unreasonable delay causes harm to the other side." Samuel L. Bray, *Beyond the Purcell Principle*, Divided Argument (June 3, 2026), https://perma.cc/LJ3G-PW4R. As this court has recently made clear, "courts sitting in equity have long abided by" that principle and the court, following suit, will not reward plaintiffs who cause "unreasonable" and "prejudicial delay in commencing suit." *Chicago Hous. Auth. v. Turner*, 2025 WL 2972665, at *5 (N.D. Ill. Oct. 20, 2025) (quoting *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 667–68 (2014)).

No plaintiff caused prejudice by unduly delaying its request for a preliminary injunction. Starting with Coinbase: Defendants argue that Coinbase knew of Illinois's new laws for months but waited too long to sue. But Coinbase simply waited to file until after it had actually "announced its partnership with Kalshi in December 2025" and promptly sued thereafter. Coinbase [48] at 14–15. Before then, Coinbase likely lacked standing to sue. *See id.* at 15. And equity is withheld only if Coinbase acted unjustly, but waiting to finalize a deal is far from unjust. Laches is therefore inappropriate as a defense against Coinbase's motion.

The United States and Kalshi filed for preliminary injunctions in June 2026. Those motions were timely to challenge Illinois's new transaction fee, which was enacted in June 2026 too. But as defendants point out, *see, e.g.*, CFTC [67] at 30–31, the United States and Kalshi waited quite a while to challenge the other provisions. For that delay, there is no clear excuse.

Delay alone, however, is not enough for laches. Laches also requires prejudice. *Turner*, 2025 WL 2972665, at *5 (quoting *Petrella*, 572 U.S. at 667–68); *see also SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, LLC, 580 U.S. 328, 333 (2017). In *Turner*, for example, the court

invoked laches because the plaintiff slept on its rights for months. *Id.* 2025 WL 2972665, at *5. After waiting so long, plaintiff wanted a TRO in three business days. *See id.* at *1. With a months-long lapse and a three-day turnaround, plaintiff had unreasonably delayed in a prejudicial way. *See id.* at *4. These cases are on a different timetable and it is unclear what prejudice is present here. Accordingly, laches is no defense.

## III. The Equities and Public Interest Favor an Injunction

The court must also weigh each side's interests, as well as the public's interest during the pendency of the suit. *Winter*, 555 U.S. at 20. In cases involving the government, these two considerations "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *Chamber of Com. of the United States of Am. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023) (applying the same logic to a preliminary injunction).

Plaintiffs' side of the scale is weighty. The private plaintiffs in this suit have obvious interests in conducting business as well as avoiding civil and criminal liability. The United States also has very clear interests in carrying out functions assigned to it by the citizenry, and in preserving federal supremacy.

Indeed, "there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their . . . operations.'" *Castañon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1064 (7th Cir. 2025). In this case, Congress has given the CFTC exclusive jurisdiction to regulate many of Kalshi's sports-related swap contracts. That choice preempts the control defendants seek to exert over Kalshi. And as another court in this district put it, there is "a strong public interest in ensuring the Supremacy Clause is properly effectuated." *Illinois Bankers Ass'n v. Raoul*, 760 F. Supp. 3d 636, 665 (N.D. Ill. 2024).

The scales tip one way in this case because defendants' side has little to no weight. Plaintiffs are likely to succeed in demonstrating that several of Illinois's laws are preempted. Neither Illinois nor the public has much interest in enforcing laws that are likely preempted.

Finally, defendants argue that "[u]nregulated sports wagering presents" serious "concerns" because it is "particularly addictive and especially attractive to young people." Coinbase [37] at 30. But Congress assigned those considerations to the CFTC, not the courts. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 193–94 (1978).

## CONCLUSION

Many of the financial instruments at issue are likely swaps as defined by the Commodity Exchange Act—they just happen to be swaps that people find entertaining and fun. Under the Act and precedent interpreting it, some Illinois law is likely preempted. Plaintiffs are therefore likely to succeed—at least in part. Plaintiffs have also demonstrated that they will be irreparably harmed without an injunction, and that the other equitable factors favor issuing an injunction. Accordingly, plaintiffs' motions—Coinbase [27], CFTC [31]; [60], and Kalshi [19]—are granted in part and continued in part consistent with this memorandum opinion and order.

Dated: October 2, 2026 /s/ Martha M. Pacold